613 A.2d 74

**COLUMBIA GAS OF PENNSYLVANIA, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 20, 1991.

Decided July 16, 1992.

As Clarified on Denial of
Reargument Sept. 21, 1992.

248

Michael W. Gang, for petitioner.

Lawrence F. Barth, Asst. Counsel, for respondent.

Kent D. Murphy, Asst. Consumer Advocate, for intervenor.

Before CRAIG, President Judge, and COLINS, PALLADINO, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

McGINLEY, Judge.

Columbia Gas of Pennsylvania, Inc. (Columbia or the utility) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission or PUC) in Columbia's base rate case. On December 12, 1989, Columbia filed Supplement No. 72 to its Tariff Gas–Pa. P.U.C. No. 8 (tariff supplement) to become effective February 26, 1990. The tariff supplement proposed changes in rates, rules and regulations designed to produce $26,265,947 in additional base-rate revenues, based upon the projected level of operations for the twelve-month period ending July 31, 1990 (the future test year).

The PUC, pursuant to its authority under Section 1308 of the Public Utility Code (Code), 66 Pa.C.S. § 1308, suspended the implementation of the tariff supplement and ordered an investigation into its justness and reasonableness. Several parties filed complaints. After hearings and submission of briefs, Administrative Law Judge James D. Porterfield (ALJ) issued a Recommended Decision on August 3, 1990, recommending that Columbia be permitted to file tariffs designed to produce an increase in annual operating revenues of approximately $12.8 million. Active parties filed exceptions and replies to exceptions, and the Commission entered its opinion and order on September 20, 1990 (Commission Decision), which permitted the filing of tariffs designed to produce $13,398,534 in additional annual revenues.

Columbia seeks review of three adverse determinations of the Commission. The principal questions presented are: (1) whether Columbia is entitled to recover as expenses the full amount of the unusual and nonrecurring costs it incurred over a period of several years to comply with an order from the Pennsylvania Department of Environmental Resources (DER) to investigate migration of pollutants from a site Columbia owns, or whether such recovery for periods before the future test year is impermissible retroactive ratemaking; (2) whether Columbia is entitled to recover in expenses the arrearage balances of the most payment-troubled customers who are maintained as active under a "budget plus" payment plan rather than terminated, where implementation of the budget

plus plan assertedly has caused such balances to grow, and auditors have informed the utility that those balances may not properly continue to be accounted for as receivable, or whether that also is retroactive ratemaking; and (3) whether Columbia is entitled to recover the amortized tax expense resulting from inclusion of the balance of its bad debt reserve accrual in taxable income under the Tax Reform Act of 1986 (TRA–86),[1] where ratepayers assertedly benefited from the accrual previously in the form of lower income tax expenses, and the Commission assertedly approved the amortization expense in prior rate filings.

■ The scope of our review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the Commission's findings are supported by substantial evidence of record. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985).

*York Plant Site Investigation Expense*

Columbia purchased the assets of the York County Gas Company in 1969, including a plant in the City of York that for many years had been used for the manufacture of gas from coal, a process that leaves coal tar as a residue. Columbia uses the site for maintenance operations. In 1985 DER ordered Columbia to undertake an investigation of the site because DER had discovered coal tar residue in a bordering creek. Columbia began to incur expenses under that order in early 1985, and it admits that it did not claim those costs in rates until the present rate filing and it projected completion of the investigation during the future test year. Columbia claimed a total of $1,091,722: $389,000 during the future test year, $203,000 during the twelve months preceding and $499,-722 for the earliest period.

Before the ALJ, Columbia's witness, John E. Skirtich, explained that "[Columbia] felt the proper treatment of the

1. Pub.L. No. 99–514, 100 Stat. 2085 (codified as amended primarily in scattered sections of 26, 42 and 19 U.S.C.).

costs was to accumulate and defer claims for the expense until there was greater certainty concerning the amount of the expense to be incurred," and that "[Columbia] surmised the best treatment would be to defer the costs ... and begin to amortize the costs over a reasonable time period after an assessment of the problem was made." Columbia Statement No. 204 at 14–15; Reproduced Record (R.R.) 363a–64a.

In filing for a general rate increase under Section 1308 of the Code, a utility must submit a record of revenues and expenses that it actually experienced for a period of one year ending no more than 120 days before the date of filing—the historic test year. 51 Pa.Code § 53.52(b)(2). In fulfilling its burden to prove that rates requested are just and reasonable, the utility is permitted to file also a projection of its anticipated expenses and revenues for a period of one year beginning the day after the end of the historic test year—the future test year. Section 315 of the Code, 66 Pa.C.S. § 315; 52 Pa.Code § 53.56. The purpose of the requirement of filing historic test year data is to provide the PUC with a picture of the utility's immediate operating history and to reflect typical conditions. *Pittsburgh v. Pennsylvania Public Utility Commission*, 187 Pa.Super.Ct. 341, 361, 144 A.2d 648, 659 (1958). Standard ratemaking practice includes adjustments to eliminate the effect of unusual and nonrecurring items that might distort the value of the historic test year data. *Dauphin Consolidated Water Supply Co. v. Pennsylvania Public Utility Commission*, 55 Pa.Cmwlth.Ct. 624, 634–35, 423 A.2d 1357, 1362 (1980).

■ Ratemaking is *prospective* in nature, that is, once established by the Commission, base rates are final for the period in which they apply.

The general rule is that there may be no line examination of the relative success or failure of the utility to have accurately projected its particular items of expense or revenue and an excess over the projection of an isolated item of revenue or expense may not be, without more, the subject of the Commission's order of refund or recovery, respectively, on

the occasion of the utility's subsequent rate increase requests.

*Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 93 Pa.Cmwlth.Ct. 410, 502 A.2d 722 (1985) *(PECO)*.[2] However, "[a]n exception to this rule in the case of retroactive recovery of *unanticipated* expenses has been recognized where the expenses are *extraordinary and nonrecurring*." *Id.* at 422, 502 A.2d at 728 (citations omitted, emphasis added). One example is expenses caused by an act of God, such as damages from a serious storm.[3] If the utility is not permitted to recover the costs of repair from such an event in its next rate case, on the grounds that rate recognition would be retroactive, then those perfectly legitimate operating expenses will never be recovered. Columbia bases its claim for full recovery of the expenses of the investigation of the York site on this exception.[4]

▮ The Office of Consumer Advocate (OCA) argued before the ALJ that none of the expenses should be allowed. The Commission's Office of Trial Staff (OTS) took the position that the $389,000 to be incurred during the future test year was properly recoverable, and should be amortized over three years, but allowance of the earlier expenses would constitute retroactive ratemaking. The ALJ adopted the position of OTS, and the Commission Decision affirmed on this point.

**2.** *See also Pike County Light and Power Co. v. Pennsylvania Public Utility Commission*, 87 Pa.Cmwlth.Ct. 451, 456, 487 A.2d 118, 121 (1985): "The Commission clearly may not establish rates which are calculated to retroactively recover surpluses or refund deficits created by inaccuracies in its prior rate authorizations."

**3.** *See, e.g., Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.*, 52 Pa.P.U.C. 77, 102, 24 P.U.R.4th 525, 548-49 (1978) (approval of installment of amortized extraordinary flood damages).

**4.** In *PECO* itself the disputed expenses were for operation and depreciation of certain new pollution control equipment. The utility requested a declaratory order from the Commission to permit a deferred accounting of the amounts claimed, pending later resolution of the merits of the claim. The PUC issued the requested order. Ultimately, however, the Commission determined that the expenses involved were neither extraordinary nor nonrecurring, and it disallowed them as not falling within the exception. This court agreed and affirmed.

Columbia interprets the exception established elsewhere and restated in *PECO* as meaning that "once an expense has been determined to be unusual and nonrecurring, and thus by definition not a normally occurring expense, then recovery of the expense is allowed as an exception to the rule against retroactive ratemaking." Brief for Petitioner at 11. The Commission Decision explained its denial of the expenses incurred before the future test year as follows:

Our review of the record leads us to conclude that the cost per year for the plant site cleanup, from the commencement of this expenditure has been readily attainable. The Company has had an opportunity in two prior rate cases to claim the expenses which had already been incurred but elected not to do so. Therefore, to permit the Company, at this time, to claim the full amount of the York plant site cleanup would be tantamount to retroactive ratemaking.

Commission Decision, slip op. at 63. The PUC and OCA also argue in their briefs that, once Columbia received the DER order, expenses associated with compliance were not "unanticipated." In addition, they emphasize that Columbia made no request for approval from the Commission for a deferral of a claim of these expenses until the full total was established— Columbia's decision not to seek recovery of these expenses as they were incurred was entirely unilateral. In our view the DER order presumably was unanticipated, and the expenses incurred under it were also, until the time of Columbia's next tariff filing, in 1986. We agree that the ongoing expenses under the DER order were completely *anticipated* after that, regardless of whether Columbia could precisely project the dollar amounts.

Columbia argues that if it had it claimed the expenses previously, the claim would have been met with a challenge that it was too speculative. That may well be true.[5] Nevertheless, a sufficiently detailed projection is not speculative—it

---

5. Before the ALJ and the Commission, OCA opposed recovery of the $389,000 relating to expenses claimed for the future test year on the grounds that they are speculative. On this appeal OCA does not pursue that position but requests only that the Commission Decision be affirmed on this issue.

is in the nature of prospective ratemaking for utilities to make projections as to all aspects of their operations when they employ a future test year. Moreover, even a claim that is not sufficiently precise to permit present recovery serves to bring the matter to the attention of the Commission, thereby creating the possibility of special accounting treatment such as that received by the Philadelphia Electric Company in *PECO.*

Columbia contends that disallowance of this claim is contrary to the holdings of *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa.Cmwlth.Ct. 69, 410 A.2d 923 (1980); *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.,* 57 Pa.P.U.C. 77, 24 P.U.R.4th 525 (1978), and *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 57 Pa.P.U.C. 1, 51 P.U.R.4th 175 (1987). In *UGI Corp.* a gas company claimed expenses for feasibility studies relating to joining a synthetic natural gas plant and a storage project. It had ended its participation some six months before the beginning of the test year. The PUC denied the claims on the grounds that they had produced no benefit to consumers. This court reversed, stating (1) (in response to a remoteness challenge) that the company should not be penalized for ending its participation in the projects before its next tariff filing and (2) that such studies in general are a regular part of the operation of a utility, and their costs should be allowed as a proper operating expense. In other words, the feasibility studies were not extraordinary and nonrecurring expenses within the test later articulated in *PECO.* Nothing in *UGI Corp.* indicated that there had been any intervening tariff filing that provided an opportunity to claim those expenses.

Columbia inaccurately asserts that the Commission approved amortization of flood damage expenses incurred three years before the rate case in *Pennsylvania Gas and Water Co.* In that case the Commission approved two flood-damage expense claims—an annual installment of $278,722 pursuant to a previously approved ten-year amortization of expenses caused by hurricane Agnes in 1972, and $6,500 for a ten-year amortization of costs resulting from tropical storm Eloise in

1975. The 1972–based claim involved an installment under an amortization plan and was not for the recovery of any new expenses. The 1975 expenses had actually been incurred after the test year (which ended before the filing was made). They had not been incurred three years before, regardless of the fact that the Commission entered its decision in the matter in 1978.

In *Duquesne Light Co.* the company filed a petition in 1978 requesting permission to impose an emergency surcharge of three mills per kilowatt-hour to recover purchased power costs it incurred as a result of a coal strike in 1977–78, which had not been recovered under the then-applicable fuel adjustment clause. The PUC granted a surcharge of two mills, effective only until June 30, 1978. The company filed a petition for reconsideration in March of 1978; the Commission did not rule on that petition until March of 1982. In the 1982 base rate proceeding, the PUC permitted recovery of the difference, despite intervening tariff filings by the company. It relied on its holding in *Pennsylvania Public Utility Commission v. West Penn Power Co.,* 54 Pa.P.U.C. 602 (1981), where it had permitted West Penn to recover purchased power costs resulting from the same emergency, which West Penn had incurred in January of 1978, before its surcharge took effect.

In each of these cases the utility took steps immediately to seek recovery of extraordinary and unanticipated expenses. In the present case, Columbia unilaterally decided not to do so. Accordingly, we agree with the Commission that recovery of the expenses incurred before the future test year would be retroactive ratemaking.

### Arrearages of Budget Plus Plan Customers

After an investigation and receipt of a report from the Bureau of Consumer Services concerning the problems of "payment troubled customers," the Commission, in June of 1985, advised Columbia and other gas and electric utilities by means of a secretarial letter that it had adopted recommendations requiring such utilities to offer budget plus payment

plans as a means of reducing the risk of termination of utility service. Under a budget plus plan a customer with an arrearage can avoid termination by agreeing to pay the monthly portion of the estimated annual cost of service plus a monthly payment toward the arrearage. In response to the Commission's letter, Columbia initiated its budget plus plan in November of 1985.

By the end of June of 1989, the total arrearages of budget plus customers grew to over $10 million. At that time Columbia had 16,490 such customers, of whom 4,318 had substantial arrearages that had grown larger in the preceding year. This group accounted for approximately $4.5 million of the arrearages, and their average repayment period was 13.75 years. In 1989 Columbia was informed by outside auditors that generally accepted accounting principles required that arrearages for accounts such as these of the most troubled ratepayers be written off as bad debts absent some assured means of recovery. In the present base rate proceeding, Columbia proposed to recover the $4.5 million either by means of (1) a surcharge of four cents per million cubic feet for two years on residential and small commercial customers (the classes eligible to participate in the plan) [6] or (2) recognition of the amount as an expense amortized over two years.[7]

OTS and OCA objected to this claim on the basis that to

6. The surcharge was to be recalculated after two years to provide ongoing recovery of prospective budget plus arrearages. The ALJ found, in regard to the surcharge proposal, that there was no evidence that Columbia was "lackadaisical" about collections or that it negotiated excessively long repayment periods. However, he found that the surcharge as proposed appeared to have an unfair impact on Small General Service customers, who represented only 1.98% of the budget plus arrearages. He rejected the surcharge proposal. Columbia has not sought review of that ruling.

7. This claim is in addition to Columbia's more ordinary request for the recognition in expenses of amounts owed to it that it expects to write off as uncollectible during the future test year. The accounts of budget plus plan customers have *not* been written off the books; they remain active accounts with the amounts listed as "receivable" *because* they are under the budget plus program. No party has sought review of the Commission's determination as to ordinary uncollectibles.

allow it would constitute retroactive ratemaking.[8] They relied primarily on the decision of the Commission in *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.*, Docket No. R–891364 (entered April 9, 1990) (*PECO 1990* ). There Philadelphia Electric Company had increased its expense claim for uncollectibles by approximately $4.8 million to reflect a six-year amortization of approximately $24 million of arrearages. Those were owed by some 26,000 customers covered by Special Payment Accounts (similar to the budget plus plan) who had repayment periods longer than four years. The Commission agreed with the panel of two ALJs that allowing such an expense would constitute retroactive ratemaking.

In the present case, the ALJ concluded that the amortized expense claim for budget plus arrearages is not different in nature from the proposed uncollectible expense in *PECO 1990* —Columbia seeks recovery of these past arrearages now because it expects never to collect them from the troubled ratepayers. He concluded that allowing this expense would also violate the rule against retroactive rates. The Commission agreed in part. It denied the request for amortization of the full $4.5 million, but it *did allow* recovery of part of the amount, as follows:

> However, it also would be unfair to Columbia not to allow an amount for the likely uncollectible expense associated with the future operation of the Budget Plus program.
>
> Therefore we believe that the annual uncollectible expense incurred by the Budget Plus program is $1.125 million (total expense of $4.5 million divided by four years of operation). Accordingly, we shall authorize Columbia to receive $1.125 million for the prospective or on-going uncollectible expense of Budget Plus arrearages.

Commission Decision, slip op. at 150. In so ruling the Commission conceded that the budget plus plan had the effect claimed by Columbia.

The only issue, therefore, is whether allowing the full claim now violates the principle of retroactive ratemaking. In our

8. OCA also contended that recognition in current rates of amounts currently characterized as accounts receivable, which would not be written off until sometime in the future, would be improper.

view, several factors distinguish this situation from that discussed above relating to the untimely claim for the York plant investigation expenses. Columbia emphasizes that it adopted and actively pursued the use of the budget plus program only pursuant to the direction of the Commission, and that the program disrupted the workings of the normal termination and bad debt recovery procedures that were in place before.

The Commission did not order Columbia to incur a direct expense, for example, by ordering necessary repairs. Rather, the Commission ordered Columbia to adopt billing and termination procedures that ultimately created increasingly large arrearages and at the same time prevented Columbia from terminating service and writing them off as uncollectible.[9] At the time of the two intervening rate cases, Columbia had no reason to seek to recover as uncollectible the arrearages claimed here, because it was complying with the PUC's direction to maintain them as accounts receivable. It was not until 1989, when the auditors informed Columbia that some of the accounts were not properly designated as receivable, that Columbia's duty was triggered to seek to terminate service and write off the accounts or to seek an assured method of payment. The money Columbia seeks to recover now as an expense definitely became owing in the past; however, under the peculiar circumstances of this case, the present rate proceeding is the first time that Columbia had an opportunity

9. OCA argues that such an effect is inherent in the nature of a budget plus plan and should have been anticipated by Columbia from the outset, thus removing this case from the *PECO* exception discussed above in relation to the York site expenses. However, the Section 1301 requirement that rates be just and reasonable protects utilities as well as ratepayers, and the definition of "rate" in Section 102 of the Code, 66 Pa.C.S. § 102, includes "any rules, regulations, practices, classifications or contracts" affecting utility charges. Columbia certainly was entitled to presume that the Commission did not direct it to adopt the budget plus program for the purpose of causing it to lose money. The express purpose of the program is to enable customers to *decrease* their arrearages, not to increase them, and for most customers the plan works.

Part of the difficulty here stems from the Commission's directing utilities to do something that substantially affects rates, in the sense of rules and practices, outside the context of a rate proceeding and without adopting a regulation.

or a reason to seek recovery of that money in rates.[10] We reverse the Commission's denial of recovery of the full $4.5 million.

### Taxes on the Balance of the Bad Debt Reserve

Section 166 of the Internal Revenue Code, 26 U.S.C. § 166, relating to bad debts, provides as a general rule in subsection (a)(1), "There shall be allowed as a deduction any debt which becomes wholly worthless within the taxable year." Before 1986, subsection (c), relating to reserve for bad debts, provided, "In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts."

Columbia's witness James E. Irwin (Irwin) testified that Columbia historically used the reserve method to compute bad debt expense for financial accounting *and income tax purposes*. Columbia Statement No. 4 at 16; R.R. 60a. The annual accrual to the bad debt reserve represented the amount of current billings that Columbia estimated were uncollectible. *Id.* Actual bad debts were deducted from the reserve as they were written off. Irwin testified that the net *accrual* (not the actual amount of uncollectibles in a given period) was deducted in calculating taxable income from which the expense for taxes was determined for ratemaking purposes; therefore, ratepayers received the benefit of the tax deduction of the full amount of the accrual. *Id.*[11]

As Columbia notes, the cornerstone of TRA–86 was a significant reduction in tax rates in general. The corporate

10. Columbia also notes that its 1986 base rate proceeding took place shortly after the implementation of the budget plus program in November of 1985, and that even the 1987 base rate proceeding employed a future test year ending July 31, 1987, only about one-and-one-half years after implementation. It argues persuasively that at such an early time any assertion that the program was not working as designed would likely have been viewed as premature.

11. The ratemaking equation is that a utility's revenue requirement (RR) is equal to its expenses plus rate of return (ROR) times the rate base (RB), which is the assets of the company that are used and useful in providing service: $RR = E + (ROR \times RB)$. The utility must be permitted to recover the legitimate and prudent expenses that it incurs in providing service before there can be any determination of the profit

income tax rate was reduced from 46% to 34% effective July 1, 1987. To compensate for lost revenues caused by the reductions, TRA–86 also provided for changes to the tax code designed to increase revenues.[12] Section 805 of TRA–86 repealed subsection (c) of Section 166.[13] For tax years beginning on and after January 1, 1987, Columbia is permitted to deduct only actual bad debts that are written off during the tax year. *Id.* In addition, TRA–86 declared that the balance of the accrual in a bad debt reserve as of December 31, 1986, was taxable income. Taxpayers were permitted to amortize that income over a period of four years. Essentially, TRA–86 dramatically changed the tax treatment of bad debts from a forward-looking accrual basis to a present, actual write-off basis, and created a one-time increase in taxes spread over four years. *Id.* at 16–17; R.R. 60a–61a. Although it was declared to be taxable "income," the balance of the bad debt reserve on December 31, 1986, was purely an accounting fiction, and it did not represent an increase in revenues or operating income for Columbia. *Id.* at 17; R.R. 61a. The balance of the bad-debt reserve at the end of 1986 was $3,105,106; one fourth of that is $776,276. Multiplying that figure by the blended tax rate of 39.61% results in a tax expense claim of $307,483.

that it is allowed to earn. Among legitimate items of expense are wages and salaries, fuel, depreciation on assets, actual taxes paid and debts owed to the utility that are uncollectible. The greater a deduction from income for tax purposes, the lower the amount to be taxed and the lower expense item of actual tax paid by the utility.

12. Columbia notes that the Commission's response to TRA–86 was to declare the base rates of utilities to be temporary and to indicate its intention to investigate those rates and to reflect the effect of the income tax reductions. The rates of utilities that were involved in rate proceedings, including Columbia, could not be declared temporary. Therefore, when the Commission approved the final settlement in Columbia's proceeding, the settlement specifically stated that it reflected the reduction in federal income tax rates. *Pennsylvania Public Utility Commission v. Columbia Gas of Pennsylvania, Inc.,* 63 Pa.P.U.C. 599, 601 (1987). There is no dispute that ratepayers benefited from reduced tax expenses resulting from the overall reduction in income tax rates.

13. Section 166 has since been further substantially amended by Section 1008(d) of Pub.L. No. 100–647, 102 Stat. 3349 (1988).

OCA opposed any recognition of this tax expense. OCA's witness, James D. Cotton, testified that ratepayers do not receive a *rate base* deduction for book or bad debt reserves, and that "the reserve for bad debts is not a factor whatsoever in the ratemaking equation." OCA Statement No. 2 at 48; R.R. 314a. As to the derivation of the bad-debt *expense* for ratemaking purposes, he said that is "a pro forma amount which is separately decided in each case and is deducted in total from the pro forma tax calculation in determination of pro forma taxes." *Id.* Therefore, he asserted, the ratepayers have already paid through rate charges all bad debt expense that the Commission had recognized and also received all associated tax benefits. *Id.*

OTS did not raise such a theoretical challenge to the legitimacy of the expense, but it recommended a lower figure based on its view that the period of amortization began May 1, 1987, and ended on December 31, 1990. OTS argued that the end of the federal period of amortization would limit the period for which the expense was claimed in this case to less than a full year.

The ALJ recommended granting the expense adjustment requested by Columbia. He concluded further that the four-year period of amortization for ratemaking purposes began May 27, 1988, because the settlement agreement by which Columbia's 1987 base rate filing was settled was the first time that the full effects of TRA–86 were taken into account. The Commission rejected the ALJ's recommendation on this issue, as follows:

> We believe that it would be inappropriate to require customers to pay a tax liability on a reserve which has been funded by the rates paid by those customers. Furthermore, we are inclined to agree with the primary position espoused by the OCA that the reserve for bad debts should not be considered as a factor in the ratemaking process.

Commission Decision, slip op. at 91.

The reserve accrual was consistently higher than the actual debt written off as uncollectible—that is why there was a

balance in the reserve at the end of 1986. So long as the federal government permitted deduction of the full amount of the accrual, Columbia's taxable income was less than it would have been if only the actual uncollectible amount had been deducted. Therefore, the total federal income tax expense charged to ratepayers was less.

It was this practice that TRA–86 put to an end. By declaring the balance in a bad debt reserve as of December 31, 1986, to be taxable income, the federal government was recapturing taxes that would have been paid previously if only actual bad debts had been deducted. As Columbia notes, the Commission understood this principle and applied it correctly in several cases, including *Pennsylvania Public Utility Commission v. National Fuel Gas Distribution Corp.*, 67 Pa. P.U.C. 264, 314 (1988):

> Distribution, in the past, has claimed deductions for bad debts for income tax purposes on an accrual basis. Distribution also has used an accrual method for bad debt expense for ratemaking purposes, and customers have received a tax deduction for all accruals that have been allowed for ratemaking purposes. Now, under TRA–86, income tax deductions for prior years accruals are being recaptured, to the extent that the accruals have not been written off (i.e., are reflected in the bad debt reserve) and Distribution's tax expense will increase. Since TRA–86 recaptures prior years' tax deductions for bad debts accruals, and since customers have received the benefit of such deduction in the past, customers also must bear the increased tax expense resulting from such recapture. Therefore, there is no basis for denying Distribution recovery of this actual income tax liability.

*See also Pennsylvania Public Utility Commission v. Pennsylvania Power Co.*, 67 Pa.P.U.C. 91, 150–51, 93 P.U.R.4th 189, 251–53 (1988); *Pennsylvania Public Utility Commission v. Western Pennsylvania Water Co.*, 67 Pa.P.U.C. 529, 553–54, 95 P.U.R.4th 470, 495–96 (1988).

OCA notes that it argued unsuccessfully before the Commission over a period of years that the accrual to the bad debt

reserve (and certain other operating reserves) represented money supplied by ratepayers, for which they should receive a reduction in rate base. The Commission consistently responded that the balance sheet operating reserve accounts were not a part of rate base, and that the expense allowances for bad debts and other operating expenses in ratemaking were based on historical experience of the actual expenses, and not on the accounting entries to the reserve accounts. *See Pennsylvania Public Utility Commission v. West Penn Power Co.*, 53 Pa. P.U.C. 410, 429, 32 P.U.R.4th 245, 263–64 (1979); *Pennsylvania Public Utility Commission v. Columbia Gas of Pennsylvania, Inc.*, 58 Pa.P.U.C. 555, 579–80, 62 P.U.R.4th 175, 198 (1984).

Based on those holdings, OCA asserts that the PUC "has drawn a clear distinction between ratemaking and bad debt uncollectible reserve accounts," and it argues that *because* the Commission has held that the ratemaking expense has no connection with the accrual, "any tax expense associated with the bad debt reserve accrual is not properly considered to be a ratemaking item, but rather is a shareholder item." Brief for Intervenor at 35. OCA quotes from the testimony of Columbia's witness Irwin, summarized above, but then asserts: "[R]atepayers received a tax reduction associated with the payment of the associated ratemaking uncollectible expense, and not the accrual. *Thus, the tax reduction received by ratepayers in the ratemaking process was not the tax deduction for bad debt reserve accrual on Columbia's tax return.*" Brief for Intervenor at 36 (emphasis added). OCA then states that because the bad debt reserve accrual did not represent ratepayer-supplied funds for ratemaking purposes, "[T]he supposition that the tax benefits arising from the balance sheet accrual accounting were directly transferred through rates to ratepayers is inapposite." *Id.*

OCA's position is nothing less than an unsupported denial of the evidence presented by Columbia that before TRA–86 the full bad debt accrual previously was deducted from taxable income, resulting in a lower item of expense for income tax. OCA is unmindful that the subject matter here is exclusively

the *income tax* on the balance of the bad debt reserve at the end of 1986. *Regardless* of the PUC's treatment of the bad debt accrual *itself* for ratemaking purposes—whether recovery of an expense is permitted for the full accrual or only for the for debts actually written off—so long as Columbia deducts the full accrual from taxable income, the expense item for income tax becomes less than it otherwise would have been. In TRA–86 the federal government statutorily ordered recapture of those prior tax benefits, and that recapture should come from the ratepayers who received them. The Commission erred in concluding otherwise.

In addition to its argument for entitlement to this adjustment on the merits of the claim, Columbia also contends that the Commission previously approved an amortization of such amounts and may not disallow an installment of such an amortization before the period expires, citing this court's holding to that effect in *UGI Corp.*, noted above. OCA and OTS both respond that Columbia's last two rate case filings were concluded by settlement agreements approved by the Commission, and the agreements did not specifically address the issue of recovery of the tax on the bad debt balance.[14] In addition, the settlement agreements included clauses specifying that no party would be bound by the terms of the settlement in any later proceeding.[15] As the PUC observes, part of the value of a settlement is the avoidance of costly litigation. One of the drawbacks is that unless an issue is specifically addressed in the settlement document, it likely will not be addressed in the Commission's order approving the settlement. The PUC notes that the burden of proof is on the

14. The last agreement included the following: "While Joint Petitioners have not sought to identify, nor would they be able to agree upon, the specific adjustments which support their respective conclusions, they do agree to and request approval of the Settlement proposed herein." Brief for Respondent at 35, citing Joint Petition for Settlement, Docket No. R–870832 at 6–7.

15. "The Settlement is proposed by Joint Petitioners to settle the instant case and is made without any admission against, or prejudice to, any positions which any Joint Petitioner might adopt during the subsequent litigation of this proceeding or any other proceeding." *Id.*, citing the Joint Petition for Settlement at 19.

utility, and asserts that Columbia has failed to prove "the specific intent of the Commission in approving these prior agreements." Brief for Respondent at 36. Therefore, the PUC and OCA argue, *UGI Corp.* is inapposite.

The PUC adds that where the federal statute provided a four-year period for amortization ending in 1990, a decision by the Commission to allow an expense claim for an amortized amount limited to a particular year before that date is not necessarily inconsistent with a later determination that a similar claim is outside the authorized period. OCA contends that if the court concludes that the tax on bad debt reserve is a legitimate expense, the court should allow recovery only for the portion of the future test year before the end of 1990.[16]

■ Because we have resolved this issue in Columbia's favor on the merits of the claim, it is unnecessary to decide whether the utility should be penalized for failing to prove the "specific intent" of the Commission in an order setting Columbia's rates. As for OCA's alternative position, we agree with Columbia that the Commission's grant of such a limited bad-debt tax expense claim would be inconsistent with the rest of its order. Another balance sheet operating expense reserve account that Columbia formerly maintained and deducted on an accrual basis was that for "unbilled revenue," which refers to service already provided but not yet billed at the end of a taxing period. TRA–86 treated the balance of this reserve precisely the same as that for the bad debt reserve, declaring it to be taxable income and allowing a four-year period for amortization. The ALJ recommended approval of Columbia's full expense claim for the tax on unbilled revenue reserve, based on a determination that the claim was proper and that the period of amortization for ratemaking purposes began on May 27, 1988. The PUC adopted this recommendation, and OCA did not appeal that part of the Commission's order. The Commission's rationale for disallowing the claim for taxes on the bad debt reserve, quoted above, had nothing to do with

16. Columbia points out in the Reply Brief for Petitioner that OCA's statement that the future test year ended August 31, 1991, is incorrect; it actually ended July 30, 1990.

any asserted expiration of the period of amortization. We consider that the period of amortization for ratemaking purposes for taxes on reserves attributable to TRA–86 is as determined by the ALJ and approved by the PUC, and it is not subject to further dispute on remand.

In conclusion, we affirm the Commission Decision as to its denial of Columbia's claim for expenses for the York plant site investigation before the current test year. We reverse as to the denial of Columbia's full claim of $4.5 million as an expense to cover the arrearages of its most troubled customers under the budget plus payment plan, and we reverse as to the denial of the expense claimed for the amortization of the tax on the accrued bad debt reserve as of the end of 1986.

## ORDER

AND NOW, this 16th day of July, 1992, the order of the Pennsylvania Public Utility Commission at Docket No. R–891468, entered September 20, 1990, is affirmed as to the Commission's denial of the claim of Columbia Gas of Pennsylvania, Inc., for recovery in expenses of money Columbia spent before August 1, 1989, relating to the investigation of coal tar residue at the York plant site.

The order is reversed to the extent that it denied Columbia recovery in expenses of the full amount that Columbia claimed as an expense for the arrearages of the most troubled customers participating in Columbia's budget plus payment program.

The order is reversed also to the extent that it denied Columbia recovery as an expense for an amortized portion of the tax imposed on the balance of the accrued bad debt reserve account at the end of 1986.

This case is remanded to the Commission with instructions to amend its existing order in accordance with the foregoing opinion.

Jurisdiction relinquished.

## ORDER

AND NOW, this day of September, 1992, we *deny* the request of Columbia Gas of Pennsylvania, Inc., for *reargument*. We *grant clarification* of the order as follows. The statement at p. 80 describing the $1.125 million granted by the Commission sua sponte for ongoing charges associated with the budget plus program as part of the $4.5 million claimed by Columbia for past arrearages is inaccurate. However, that inaccuracy is inconsequential because it does not affect the reasoning of the opinion on this issue, and the problem is cured by the direction in the Order that the full $4.5 million claimed by Columbia for past arrearages be recovered in rates.