**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 2004.

Decided Nov. 8, 2004.

Publication Ordered March 1, 2005.

Thomas P. Gadsden, Philadelphia, for petitioner, Pennsylvania–American Water Company.

Dianne E. Dusman, Harrisburg, for petitioner, Irwin A. Popowsky.

Stanley E. Brown, Harrisburg, for respondent.

BEFORE: SMITH-RIBNER, Judge, SIMPSON, Judge and JIULIANTE, Senior Judge.

OPINION BY Judge SIMPSON.

The Office of Consumer Advocate challenges two aspects of the Pennsylvania Public Utility Commission's (PUC) order approving a general rate increase for Pennsylvania-American Water Company (Utility) under the Public Utility Code.[1] Specifically, the Consumer Advocate questions the legality of the retroactive recovery of increased security costs for a closed period following September 11, 2001, and it questions the process of determining the Utility's cost of common equity.

Consumer Advocate filed a formal challenge to Utility's proposed Supplement No. 141 to Tariff Water-Pa.P.U.C. No. 4, based on a future test year ending December 31, 2003. Extensive proceedings before an Administrative Law Judge (ALJ) ensued.

The ALJ issued a recommended decision which proposed significant reductions in additional revenue. The most important for current purposes was the rejection of retroactive recovery of increased security costs for the period October 2001 to August 2003, amounting to about $16.8 million. Notably, the ALJ recommended approval of prospective recovery of increased security costs.

In addition, the ALJ recommended a rate of return for Utility. As part of this process the ALJ identified the capital structure of the Utility, comprised of long-term debt, preferred stock and common stock. Then, the cost of each component of the capital structure was estimated. The cost of common equity, at issue here, was estimated at 10.0%.

On consideration of exceptions, the PUC allowed both retroactive[2] and prospective recovery of increased security costs. The PUC relied on *Popowsky v. Pennsylvania Pub. Util. Comm'n,* 695 A.2d 448 (Pa. Cmwlth.1997) (*PPL II*), and concluded that, similar to that case, the retroactive charges here result from an extraordinary and nonrecurring one-time event, the terrorist attack of September 11, 2001.

Regarding the common equity cost rate, the PUC accepted the basic recommendation of 10.0% but added a "financial risk" adjustment. The resulting cost rate for common equity was 10.6%. This adjustment allegedly adds $6 million to Utility's revenues.

On appeal to this Court,[3] the Consumer Advocate raises two issues: whether retroactive recovery of increased security costs is consistent with law and the facts here; and, whether the PUC's adjustment in the cost of common equity is supported by the record and consistent

---

1. 66 Pa.C.S. §§ 101-3316.

2. The PUC made three adjustments not at issue here, including a doubling of the amortization period from five to 10 years.

3. Our review of a PUC order is limited. We must determine whether constitutional rights were violated, an error of law was committed or whether the findings, determinations or order are supported by substantial evidence. *Popowsky v. Pennsylvania Pub. Util. Comm'n,* 853 A.2d 1097 (Pa.Cmwlth.2004). Rate-making questions require the exercise of the PUC's expertise, and reviewing courts tend to defer to the PUC's exercise of discretion in that area. *Phila. Suburban Water Co. v. Pennsylvania Pub. Util. Comm'n,* 808 A.2d 1044 (Pa.Cmwlth.2002).

with established economic theory. Utility participates as intervenor.

## I.

First, the Consumer Advocate challenges retroactive recovery of increased security costs. It argues that recovery of prior period costs is contrary to the premise that ratemaking is prospective, structured around a "test year." Acknowledging that an exception exists for recovery of extraordinary and nonrecurring expenses, it contends the costs here are, regrettably, normal and recurring.

The Consumer Advocate attempts to distinguish *PPL II*, which permitted retroactive recovery of costs occasioned by an extraordinary and nonrecurring event. In that case the event was a change in accounting method, and, unlike here, the costs associated with the change were not continuously incurred in the future.

The Consumer Advocate contends *Philadelphia Electric Co. v. Pennsylvania Pub. Util. Comm'n*, 93 Pa.Cmwlth. 410, 502 A.2d 722 (1985)(*PECO 1985*), controls. In that case, the PUC disallowed recovery of deferred pollution control expenses incurred during a period which constituted part of the "test year." The PUC determined the costs were neither extraordinary nor nonrecurring.

The PUC and Utility rejoin that September 11, 2001 constituted an extraordinary and nonrecurring event which under the rule of *PPL II* and *Popowsky v. Pennsylvania Pub. Util. Comm'n*, 164 Pa. Cmwlth. 600, 643 A.2d 1146 (1994)(*PAWC*) justifies the retroactive recovery of costs incurred.

## A.

The PUC clearly may not establish rates which are calculated to retroactively recover surpluses or refund deficits created by inaccuracies in its prior rate authorizations. *Pike County Light and Pwr. Co. v. Pennsylvania Pub. Util. Comm'n*, 87 Pa.Cmwlth. 451, 487 A.2d 118 (1985). However, the PUC may take into account extraordinary losses or gains occurring in the past by amortizing them over a period of years. *Id.* A review of cases of the past 20 years discussing this exception to the general prohibition against retroactive ratemaking is helpful.

In *Pike County*, before remanding for further fact finding, this Court held that requiring the utility to recognize extraordinary carryover losses from prior periods against its present claim did not constitute retroactive ratemaking. *Id.* at 121. The Court set forth the legal standards previously stated, citing prior PUC determinations involving deferred taxes, tax deficiencies and tax refunds. There was no discussion of whether the losses were anticipated or recurring.

The issue was next addressed in *PECO 1985*, an *en banc* decision concerning recovery of deferred maintenance and depreciation expenses for pollution control facilities. Significantly, the expenses were incurred during a period which constituted a portion of a prior "test year," yet the expenses "were not, for whatever reason, anticipated by the utility nor made the subject of evidence before the [PUC].  . . ." *PECO 1985*, 502 A.2d at 726. Referencing cases involving storm damages and costs of implementing new tariffs, costs of installing a leased computer, storm drainage expense, and employee replacement and training costs for startup of new generating unit, we stated, "An exception to this rule in the case of retroactive recovery of unanticipated expenses has been recognized where the expenses are extraordinary and nonrecurring." *Id.* at 728 (citations omitted). We held that the expenses in question were neither extraordinary nor

nonrecurring; therefore, retroactive recovery was not allowed, although prospective recovery was permitted.

Next, in *Columbia Gas of Pennsylvania, Inc. v. Pennsylvania Pub. Util. Comm'n,* 149 Pa.Cmwlth. 247, 613 A.2d 74 (Pa. Cmwlth.1992), the utility sought recovery of past expenses incurred over several years to comply with an administrative order to investigate migration of pollutants from a site it owned. We noted that the administrative order was unanticipated, as were the expenses incurred under it until the time of the next tariff filing. *Columbia Gas,* 613 A.2d at 77. However, we affirmed the decision that the utility did not expeditiously seek recovery of the expenses and that belated recovery constituted improper retroactive ratemaking.

The utility was also required to write off a portion of arrearages of its most payment-troubled customers, which arrearages were mounting under a budget payment program imposed by the PUC. The Court concluded that, despite intervening rate filings, recovery of these expenses was within the exception because the utility claimed them at the first reasonable opportunity.

Thereafter, this Court considered several cases dealing with expenses arising from a change of accounting method. The first of these was *Popowsky v. Pennsylvania Pub. Util. Comm'n,* 164 Pa.Cmwlth. 338, 642 A.2d 648 (Pa.Cmwlth.1994)(*PPL I* ), a case we described as unique because it dealt not with a rate order but with a declaratory order. In *PPL I,* we discussed the extraordinary expenses that qualified as an exception to the prohibition against retroactive ratemaking. As examples, we referenced weather-related expenses caused by what is commonly referred to as an "act of God," such as flood damages and cold weather maintenance expenses for thawing and repairing frozen mains. We stated,

> We believe that any unanticipated, nonrecurring, substantial expense to the rate base that would be normalized out if occurring in a test year is 'extraordinary.' ... To be extraordinary, it must also be a substantial, one-time expense or a substantial item that will not appear as a continuing expense and could otherwise never be recovered in rate cases because, like the weather-related expenses, it would be normalized out of the test year as abnormal.

*Id.* at 652. Ultimately, we held the expenses arising from the change in accounting methods were anticipated, recurring, and otherwise could be recoverable in rates, and retroactive recovery was not allowed. Notably, the discussion of "extraordinary" in this case has not been used in following cases.

About two weeks later, the same panel addressed the issue again in *PAWC,* a rate case. This Court analyzed three factors in its determination that recovery of the transitional expenses incurred in switching from cash to accrual accounting was not impermissible retroactive ratemaking: whether the increased expenses arose out of inaccurate projections; whether the transition was an extraordinary, one-time event; and, whether the utility enjoyed a prior opportunity to seek recovery of the expenses. The Court concluded the application was timely and that the expenses arose from an extraordinary and non-recurring one time event.

Most recently, in *PPL II,* the Court *en banc* considered the effect of the change of accounting method. We distinguished *PPL I* because it was not a rate case. Also, the Court specifically adopted the analysis in *PAWC.* First, we noted the expenses did not arise out of an inaccurate projection in an earlier proceeding. Sec-

ond, citing *Pike County*, we recognized the PUC's authority to take into account extraordinary losses and gains. Third, we rejected arguments that the utility waited too long in seeking recovery of the costs. As in *PAWC*, we affirmed the PUC's approval of recovery of the transition costs.

■ A review of these cases reveals the developing analyses in cases involving recovery of expenses alleged to be extraordinary. First, we consider whether the costs arise out of an inaccurate projection in an earlier proceeding. *PPL II; PAWC; PECO 1985.* In this regard, we may consider whether the costs were anticipated and whether they were imposed on the utility from the outside. *PPL II; PAWC.*

Next, we evaluate the extraordinary nature of the costs. In the past, we have considered whether the expenses themselves are extraordinary and nonrecurring. *PECO 1985.* More recent cases also contemplate whether the triggering event was an unanticipated, extraordinary, one-time event. *PPL II; PAWC; see Columbia Gas.* In addition, the Court occasionally discusses whether the expenses are legitimate operating expenses which, if recovery is denied on the grounds that rate recognition would be retroactive, will never be recovered. *Columbia Gas.*

Also, we analyze whether the utility claimed the expenses at the first reasonable opportunity. *PPL II; PAWC; Columbia Gas; see PECO 1985.* On this aspect of the analysis, we may address whether the utility acts as though the expenses are something it can absorb with its current revenue under its existing tariff. *PPL II.*

**B.**

■ Applying the developing analysis for this issue, we discern no error in the PUC's decision to allow recovery of increased security costs for the period after September 2001, and before the proposed effective date of the current tariff.[4]

**1.**

As to whether the costs arise from an inaccurate projection in a prior proceeding, we agree with the PUC that the tragedy of September 11, 2001 marked a unique moment in time which will forever change this country's view of what it considers necessary and appropriate security measures. *Pa. P.U.C. v. Pennsylvania–American Water Co.*, Docket No. R–00038304, January 29, 2004 at 46–47. In response to the attack, various statutes dealing with security were passed, and various administrative actions were taken. Utility responded to them. There is no credible argument that the increased costs arose from inaccurate projections, and there is no reasonable dispute that the increased costs were imposed from the outside.

**2.**

Regarding the issue most fully discussed by the parties, the extraordinary nature of the expenses, we agree that the triggering event was extraordinary and, hopefully, nonrecurring. Further, while we now face the reality that increased security expenses will continue, it cannot be said that sad reality was appreciated at the time they were incurred. Considering both the nature of the triggering event and the nature of the expenses at the time they were incurred, we conclude the increased security costs arising after September 11

---

4. The period at issue is described for conceptual clarity. The actual period is somewhat different because amounts were not certain at

the time the record closed. This detail is not part of the issue we are asked to decide.

were extraordinary within the rule described in *Pike County*.

Moreover, the increased security costs are legitimate operating expenses. If the Consumer Advocate's argument of retroactive ratemaking is accepted, it is unclear how the unanticipated, substantial expenses will ever be recovered. This concern, first voiced in *Columbia Gas*, supports a conclusion that the expenses are extraordinary within the *Pike County* rule.

### 3.

Finally, we agree with the PUC that Utility took immediate and responsive action to seek timely recovery of its costs. Opinion and Order, *Pa. P.U.C. v. Pennsylvania–American Water Co.*, Docket No. R–00038304, January 29, 2004 at 47.

At the time, Utility had a rate case pending in which the record was closed. *Id.* Utility elected not to reopen that case and request consideration of increased security costs. A final order was entered on January 25, 2002.

On November 26, 2002, Utility sought a surcharge to address the increased costs. The PUC denied the requested surcharge, but it permitted deferred accounting treatment in anticipation of consideration of the costs in the next general rate case. The PUC stated future rate recovery was not assured.

While the surcharge request was pending,[5] Utility filed for another general rate increase. As part of its case, Utility again claimed the increased security costs incurred after September 11, 2001, as well as increased security costs on a continuing basis.

Given the foregoing, Utility obviously did not regard the expenses as something it could simply absorb with its current revenue under its existing tariff. *See PPL*

*II*. Similar to the payment program arrearages in *Columbia Gas*, and despite a pending rate filing, recovery is within the exception for extraordinary items because Utility claimed them at the first reasonable opportunity.

### II.

█ Second, the Consumer Advocate challenges the PUC's financial risk adjustment to the common equity cost rate. Initially, it questions whether substantial evidence supports the adjustment, since no witness stated a 0.6% adjustment was appropriate, and the amount of the adjustment was not otherwise quantified in the record.

Similarly, the Consumer Advocate contends the adjustment is not consistent with economic theory. In this regard, it argues the adjustment violates the prohibition against policy based adjustments and the adjustment "double counts" financial risk. Finally, it contends financial risk results from increases in fixed debt financing, not from valuation of common stock.

The PUC and Utility emphasize the limited review of its discretionary decisions. *West Penn Power Co. v. Pennsylvania Pub. Util. Comm'n*, 147 Pa.Cmwlth. 6, 607 A.2d 1132 (Pa.Cmwlth.1992) (PUC's .54% adjustment to results for equity cost rate within its area of expertise). Also, the PUC and Utility defend the adjustment as supported by substantial evidence. In particular, Utility highlights the testimony of its expert, who recommended a "leverage" adjustment of about 0.8%. Reproduced Record (R.R.) at 897a–900a.

As to economic theory, the PUC explains the reasons the common equity cost rate adjustment is appropriate. First, the

---

5. Appeal was taken from this surcharge decision, but it was ultimately discontinued.

formula used to estimate cost rate [6] is market based, but Utility's stock is not publicly traded and is listed at a much lower book value. Under these circumstances the formula can understate the cost of capital. Second, because of mergers and acquisitions, the number of comparable companies used in the formula is so small as to raise questions as to the usefulness of the method.

Similarly, Utility highlights the testimony of its expert, who opined that "[t]he capital structure ratios measured at the utility's book value show more financial leverage, and hence higher risk, than the capitalization measured at its market values." R.R. at 897a.

Both the Consumer Advocate and the PUC refer to cases in other jurisdictions and to learned treatises in support of their positions. Also, all parties refer to equity cost determinations in other cases.

As part of its overall determination of a fair rate of return, the PUC assigns a fair rate of return for each component in a utility's capital structure. This requires two decisions for each type of capital. First, the PUC determines the amount of each type of capital. The amount of each is expressed as a ratio or percentage of the entire capital structure. *See,* James H. Cawley & Norman James Kennard, Rate Case Handbook, 232–36 (1983). Regarding the common equity ratio here, the PUC determined the amount of common stock as 42.2%, calculated on the book value of the common stock. *See, id.*

Second, the PUC determines the cost of each type of capital. Pertinent here, the PUC determined the cost of Utility's common stock. In this context, the cost approximates the present value of investors' expected future cash flows from both dividend yields and market value appreciation. *West Penn Power Co.,* 607 A.2d at 1133, n. 3. The cost is called the common equity cost rate, and the market value appreciation component was derived here in part by analyzing the market performance of the common stock from comparable companies. *See,* Rate Case Handbook, at 249–50.

The present issue involves the application of a market value cost to a book value amount of common stock. The PUC made its adjustment to the common equity cost rate in recognition of the "financial risk" arising from the different valuation methods.

No witness stated that 0.6% was an appropriate adjustment. However, as Utility's expert opined that an adjustment of about 0.8% was appropriate, the record supports an adjustment larger than that approved. Further, case law supports an adjustment. *E.g., West Penn Power Co.* Also, the amount of the adjustment is exactly the same in this case as in the last rate proceeding involving Utility. R.R. at 900a. That prior order was not appealed. Under these circumstances, there was no abuse of discretion in making the identical adjustment.

Contrary to the Consumer Advocate's assertions, *United States Steel Corp. v. Pennsylvania Pub. Util. Comm'n,* 37 Pa. Cmwlth. 195, 390 A.2d 849 (1978), does not compel a different result. In that case, the PUC referred to no evidence and offered no explanation for its finding on

---

**6.** The PUC considered several methods of evaluation. As in the last rate case involving Utility, the PUC primarily relied on the Discounted Cash Flow (DCF) method and informed judgment. The DCF method is commonly expressed in terms of a representative dividend yield plus a growth rate to capture investors' expectations of future increases in cash dividends. Use of the DCF method is within the discretion afforded the PUC. *West Penn Power Co.*

common equity cost rate. *Id.* at 862–63. As a result, we returned the case to the PUC to make findings on the cost of equity. Here, the PUC refers' to testimony and offers an explanation.

For all the foregoing reasons, the PUC's order is affirmed.

### ORDER

AND NOW, this 8th day of November, 2004. The order of the Pennsylvania Public Utility Commission regarding Pennsylvania–American Water Co.'s proposed Supplement No. 141 to Tariff Water–Pa. P.U.C. No. 4 is **AFFIRMED.**

### DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from that part of the Majority's decision affirming the order of the Public Utility Commission (Commission) allowing the Pennsylvania–American Water Company (Utility) to recover increased security costs for the period from September 11, 2001 through August 2003. I cannot agree that the increased security costs are properly characterized as extraordinary and nonrecurring expenses; therefore, allowing such a recovery would violate the principle that the Commission may not engage in retroactive ratemaking.

This Court in *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 93 Pa.Cmwlth. 410, 502 A.2d 722 (1985), affirmed in part a Commission order disallowing the retroactive recovery of operation and depreciation expenses incurred because of the operation of pollution control equipment required by a consent degree imposed during litigation by state and federal environmental protection agencies. The Court stated what I find to be the most useful formulation of principles governing a request to retroactively recover unforeseen expenses:

In our judgment, the Commission has here correctly applied these basic regulatory tenets. The general rule is that there may be no line examination of the relative success or failure of the utility to have accurately projected its particular items of expense or revenue and an excess over the projection of an isolated item of revenue or expense may not be, without more, the subject of the Commission's order of refund or recovery, respectively, on the occasion of the utility's subsequent rate increase requests.

An exception to this rule in the case of retroactive recovery of unanticipated expenses has been recognized where the expenses are extraordinary and nonrecurring. We agree with the Commission that the pollution control facilities' expenses here at issue are clearly neither extraordinary nor nonrecurring. Indeed, PECO here claimed and was granted the *prospective* operating, maintenance, and depreciation expenses associated with these facilities.

*Id.* at 727–728 (citations omitted). *See also Popowsky v. Pennsylvania Public Utility Commission*, 164 Pa.Cmwlth. 338, 642 A.2d 648, 651 (1994) ("The rule against retroactive ratemaking prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits").

Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, requires that every public utility "furnish and maintain adequate, efficient, safe, and reasonable service and facilities." Part of that ongoing obligation in this case is to secure the water supply and infrastructure against contamination and violence and, as the ALJ noted, that duty existed before September 11, 2001 and it continues today. The Utility's unopposed claim for prospective security costs of some $3.5 million per

year is evidence of its ongoing obligation. Although the *events* of September 11, 2001 were by any fair measure unanticipated and extraordinary, the *types of expenses* necessary to secure public utility facilities are normal and ever-present operation and maintenance expenses.

The Commission noted that the Utility's actions in making such expenditures are commendable. However, because of the ongoing and mandatory nature of security expenses, and in light of the Utility's annual revenue requirement of approximately $357 million and a rate base of approximately $1.5 billion, I cannot conclude that the approximately $16.7 million in deferred security costs, accrued over a nearly two-year period, constitutes an extraordinary expense. Elevated levels of spending for security are now part of the regulatory environment, more so than in the past, but those expenses should be addressed prospectively through comprehensive rate review and not retroactively by separating unforeseen expenses from the previously agreed upon rate structure.

I do not believe this case presents a compelling argument for an exception to the rule that the Commission may not allow recovery of unanticipated expenses through retroactive ratemaking. Instead, I am persuaded by the following observation of the ALJ in assessing the nature of the deferred costs for increased security:

It is, in fact, the belief that vulnerable PAWC facilities will be targeted in some manner for future attack that justifies the allowance of PAWC's claim for $3,536,179 in security expenses per year on a going-forward basis. It is, sadly, a fact that for the foreseeable future PAWC will, each and every year, have to incur security costs to protect its facilities used in providing public utility service from potential terrorist attacks. These costs, like all of PAWC's costs in providing public utility service, must be reasonably and prudently incurred, but if they are, they are recoverable from the ratepayers. These costs will recur on an annual basis for as far as anyone can presently predict into the future. To say that the deferred costs are non-recurring, as they must be to qualify for rate recovery as an exception to the rule against retroactive ratemaking, would be totally illogical and inconsistent with the obviously recurring security costs claimed by PAWC for future years.

ALJ Recommended Decision at p. 32. For the foregoing reasons, I respectfully dissent.