## Pittsburgh *v.* Pennsylvania Public Utility Commission, Appellant.

Argued January 7, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*W. James MacIntosh*, with him *Ernest R. von Starck, Paul Maloney, John B. King, Clarence W. Miles, Wm. Clarke Mason* and *Morgan, Lewis & Bockius*, for Bell Telephone Company of Pennsylvania, appellant.

*William J. Grove*, with him *Jack F. Aschinger* and *Lloyd S. Benjamin*, for Pennsylvania Public Utility Commission, appellant.

*Anne X. Alpern*, City Solicitor, with her *John M. Marshall*, Assistant City Solicitor, for City of Pittsburgh, appellee.

*M. H. Goldstein* and *Joseph R. Rose*, for Pennsylvania Industrial Union Council.

OPINION BY MR. JUSTICE CHIDSEY, April 22, 1952:

Claiming that substantial increases in the cost of both labor and materials had resulted in an increase in the cost of furnishing telephone service considerably greater than the growth in revenue resulting from a larger volume of business, the Bell Telephone Company of Pennsylvania on November 19, 1948, filed tariff revisions proposed to become effective January 21, 1949. These tariffs sought increased revenue in the amount

of $24,600,000. They affected rates and charges of the Company for the rendition of intrastate telephone service other than intrastate toll service, rates for which were not changed. The Commission suspended the effective date of the proposed tariff revisions and on its own motion instituted an investigation to determine the reasonableness thereof. Formal complaints were filed by the City of Pittsburgh, the Pennsylvania Industrial Union Council and others. Additional parties were allowed to intervene as complainants. After extensive hearings resulting in a record of 3,352 pages and 109 exhibits, the Commission handed down an order on October 17, 1949, which permitted Bell to increase its intrastate operating revenues by $17,963,090. The Company immediately revised its rates to comply therewith and they are now in effect.

The City of Pittsburgh and the Union Council appealed to the Superior Court, raising numerous issues. On July 19, 1951, the Superior Court handed down its decision sustaining the order of the Commission in all but two respects, namely, the allowance by the Commission of a sum of $6,200,000 as cash working capital as an element of fair value in fixing the rate base and the inclusion by the Commission of certain pension costs in operating expenses. Following petitions by the Company, the Commission, and the City of Pittsburgh joined in by the Union Council, raising various questions, this Court allowed an appeal, restricted, however, to the action of the Superior Court with respect to cash working capital and with respect to the inclusion in operating expenses of pension fund requirements.

After separating the Company's property, revenues and expenses employed in rendering interstate service from that employed in intrastate service, the Commission fixed the fair value of its property used in the

latter service for rate making purposes at $410,000,000. Included in this amount was the sum of $6,200,000 allowed by the Commission as cash working capital.

Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor. It is the blood stream that gives life to the physical plant and facilities of the enterprise. It can readily be seen that initially, at the commencement of operation, capital supplied by investors must, in order that the Company can function, include such working cash in addition to the amount required for physical plant and facilities. Its allowance as an element of fair value for rate making purposes has been approved by decisions of both the Superior and Supreme Courts of this State and of the appellate courts of other jurisdictions. Almost invariably, however, its allowance has been determined by the actual necessity therefor existent when disputed rates of an established and going concern are before the Commission. The determination of the dollar amount of cash working capital is based on the time lag between the service rendered and the payment therefor by the consumer.

The fair value of a utility for rate making purposes is the value fixed at the time rates are established. To the extent that the customers are providing revenues before the utility pays its costs, the investors are not supplying the funds to carry on. Whether cash working capital should be allowed as an element in determining the fair value of a utility's used and useful property as a rate base, and if allowed, the extent of such allowance, depends upon the factual situation in each case. If the financial situation of an operating company shows that sufficient funds are readily available to bridge the gap between rendition of and pay-

ment for services, no cash working capital is required and none should be allowed by the Commission.

The Bell Company sought intrastate revenues under its proposed rates of $168,741,000. Its intrastate revenues prior to the filing of its new tariff amounted to $143,036,000. The Commission allowed revenues in the amount of $160,999,090. The evidence disclosed that the Company's bills for telephone service are rendered monthly in advance for local monthly charges and similar items comprising about 53% of total revenues. Bills for toll service and local message charges totalling about 38% of revenues are rendered monthly in arrears. The remaining 9% of revenues is obtained from coin box collections. Amounts billed in advance are not paid on the average until after the services involved have been rendered. Collection experience showed an average lag of 11½ days between the time service is rendered and the time payment is made for the local exchange service which is billed in advance, a lag of 41½ days for toll service, and a lag of 24 days for coin box collections.[1] The over-all weighted average interval between the time service is rendered and the time that payment is made is a period of 24 days.

On the other hand, there was testimony of a lag averaging 30 days in the Company's payments to Western Electric Company from which it purchased equipment. In 1948 sales by Western Electric Company to Bell amounted to $52,497,000. There was also a 10-day lag in the monthly payments of license fee to American Telephone & Telegraph Company. In 1948 Bell paid American Telephone & Telegraph Company under the license contract $1,942,242. There were other substantial lags in the Company's payments for goods and

---

[1] Bell claimed that the lag in the receipt of coin box revenues resulted despite the fact that it employed the most efficient method of periodic collections.

services rendered it. However, the Company claimed as a very substantial offset its payment in advance of the costs of telephone directories. It was estimated that the cost thereof was met 138 days in advance of their utilization. A weighted average of the costs of the directories paid in the year prior to their use was taken, and the service rendered by these directories for a 12-month period was averaged as the middle of the period and this was taken as the date of utilization in the estimate made. With consideration given to this estimate of 138 days of prepayment for directories, an exhibit was introduced by the Company based on a study of the last 6 months of 1947 which showed a weighted average lag of 4.81 days in the payment by the Company for goods and services received.

The evidence also disclosed that Bell accumulates an unsegregated fund in excess of $13,000,000 for federal and state income tax purposes.[2] An examination of the financial situation of Bell may show other reserves and accumulations readily available. Considering the evidence relating to income taxes, an average of 13 months elapses between the time this amount has been collected in revenues and the time the taxes are paid to the federal and state governments. The fund is set up as a bookkeeping reserve but is commingled with other funds of the Company.

The Company claimed allowance of $9,300,000 as cash working capital for total operations, based on requirements for one month's operating expenses, exclusive of all taxes, depreciation and net wiring loss. The Commission fixed the amount at $7,000,000 for total operations and then apportioned and allowed $6,-

---

[2] The Company pays corporate income taxes in four equal instalments during the year following the earning of the income for which the tax is levied. The Company asked for and the Commission allowed $12,956,221 for income taxes.

200,000 for intrastate operation. The Commission's decision was based on the 24-day lag above referred to. It ignored the counteracting effect of the lag enjoyed by the Company in the payment of its obligations and as well the availability for cash working capital purposes of the amount collected and allocated for income tax purposes.

The Superior Court, recognizing the failure of the Commission to take into consideration factors counteracting the need for cash working capital based on a 24-day lag, reversed the Commission's allowance of $6,200,000. However, we think that the Superior Court placed undue emphasis upon the balance sheet position of Bell either at a particular time or over a period of time as a factor in determining the need for cash working capital. Fluctuations in the cash and current asset position of a company are controlled by managerial policy. Such position has little to do with cash working capital requirements which basically depend upon such factors as, for instance, whether the Company follows a policy of paying out dividends relatively soon after they are earned or accumulating a large surplus. The balance sheet position *per se,* if a material factor, is one of the least important factors in determining the need for cash working capital. The sole question is one of lag and if, for example, under the management and practices of the Bell Company lags in the payment of its obligations and the accumulation from revenues of the sum of $13,000,000[3] for taxes

[3] In its brief the Company states that funds held for the payment of tax liabilities already accrued cannot be regarded as being constantly available as cash working capital for the payment of other current operating expenses because there is nothing to prevent Congress at any time from placing the payment of corporate income taxes on a current basis or from increasing tax rates retroactively. The answer to this suggestion is that if substantial changes in this respect eventually occur, eliminating the availability

eliminates the need for cash working capital, no allowance therefor should be made, and this irrespective of the bookkeeping ratio of current assets to current liabilities.

It is claimed by counsel for the Company that Bell would assume a risk contrary to prudent management if funds which normally would be maintained to pay income taxes as they become due were used for the payment of operating expenses. The amount of cash allocated for income taxes is a bookkeeping item only and such cash is mingled with other funds and available for operating expenses. It is to be kept in mind that cash working capital is not allowed as an operating expense but is a hypothetical amount used in the determination of fair value as a rate base. The amount allowed does not become a part of allowable revenues but only the return which is allowed on such amount. Thus at the 6% return allowed by the Commission, 6% of $6,200,000 (included in fair value as cash working capital), or $372,000, would become a part of allowable revenues. The Commission allowed for operating expenses the sum of $136,399,090. The Company did not appeal from the Commission's findings and order, so apparently it can successfully pay all operating costs and meet the need of working cash by receipt in revenues of $136,771,090 for operating costs instead of $136,399,090, the difference or additional $372,000 representing the actual amount required to take care of the assumed 24-day lag in receipt of payments for services rendered. This sum, $372,000, if not received in revenues because of no allowance for cash working capital, is therefore the amount that

of such funds, the Company if adversely affected, may apply for a rate adjustment. The matter must be determined upon the factual situation presented in the record before the Commission at the time of the making of its order on October 17, 1949.

would have to be temporarily taken for working cash from the accumulation for income taxes and restored at the end of each lag interval.[4] The risk assumed in not always maintaining in the Company's general funds an accumulating amount sufficient to pay income taxes is, therefore, negligible. Of course if other factors herein discussed offset the lag in receipt by the Company of payments for services, there is no need for any sum for working cash.

We are also in accord with the Superior Court's conclusion that the ability of the Company to obtain temporary loans without adverse effect upon its credit is a matter to be considered with respect to the allowance of an amount as cash working capital. American Telephone & Telegraph owns all of Bell's capital stock. In the brief of counsel for the Company, referring to the testimony of the Company's chief accountant, J. J. Scanlon, it is stated that ". . . the Company operates with what is in fact a negative net current asset position because its parent company keeps large amounts of funds on hand at all times which are available to the Company and its sister companies in the Bell System on a day to day basis. This avoids the necessity of subsidiaries carrying large balances, and enables funds to be shifted throughout the System as needed. It is a matter of record that the portion of net current assets of the American Telephone & Telegraph Company which is allocable to the Company is far in excess of the $6,200,000 allowed by the Commission." The Superior Court correctly analyzed Bell's borrowing capacity in relation to its need for cash working capital, when it said: "This $6,200,000 allowance [for cash

---

[4] The Company uses rotary billing. Bills are submitted in substantially equal increments of revenues to portions of its subscribers on the 1st, 6th, 11th, 16th, 21st and 26th of each month. Accordingly, revenues are flowing constantly to the Company.

working capital] enables the utility to collect from its customers (at the 6% allowed return) the sum of $372,000. A. T. & T., the parent company, has been making loans to Bell at 2¾%. It is also notorious that short term loans to a corporation of the wealth of Bell can be made at 2½%,—with the lender well pleased with the bargain. Thus if cash working capital is needed it can be obtained at a cost of $155,000, instead of the imposition of $372,000 upon the rate-payers. . . It is also certain that the credit of Bell will not be adversely affected if short term loans are made to care for the 24-day time lag. . .".

It is also urged that the Commission's action with reference to the allowance made by it of cash working capital as an element of fair value is not subject to judicial review. This claim is based upon Section 1107 of the Public Utility Law, 66 PS §1437, which provides: ". . . The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights. . .", and cases of the Superior Court holding that judicial review does not include the substitution of the Court's judgment for that of the Commission: *Pittsburgh et al. v. Pennsylvania Public Utility Commission*, 158 Pa. Superior Ct. 229, 44 A. 2d 614; *Pittsburgh v. Pennsylvania Public Utility Commission*, 168 Pa. Superior Ct. 95, 78 A. 2d 35.

We do not regard the section quoted of the Public Utility Law or any of the cited decisions of the Superior Court as precluding review where the Commission has arbitrarily ignored material and undisputed evidence, misconstrued the facts or misapplied the law. In the instant case in determining the need for cash working capital the Commission adopted testimony of

a 24-day lag in the receipt of payments for services rendered but in arriving at its conclusion completely ignored undisputed competent evidence coming from the same source that either reduced or eliminated the need. This was not an exercise of judgment by the Commission but an arbitrary and unreasonable finding. See *Erie City et al. v. Public Service Commission,* 278 Pa. 512, 529, 123 A. 471; *The Peoples Natural Gas Company v. The Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 475, 491, 492, 34 A. 2d 375; *Cole et al. v. Pennsylvania Public Utility Commission,* 146 Pa. Superior Ct. 257, 22 A. 2d 121.

We conclude that the Commission's finding constituted reversible error and there must be a redetermination by it after giving effect to all pertinent factors which were excluded from its determination. Such redetermination can and should be made without taking additional testimony and therefore is to be based upon the record as presently constituted.

The second problem is concerned with pensions. The Commission allowed as an operating expense for pensions $5,993,000. This amount represents the sum necessary to be paid into the pension trust fund when computed on an accrual basis rather than on a pay-as-you-go basis, plus a sum ($541,370) designated as a freezing payment (to be later fully explained). The Superior Court reversed the Commission and sent the case back for it to disallow so much of the $5,993,000 (called in rounded figures $6,000,000) attributable to the failure of the Bell officials to adopt the full accrual system in 1927.

Bell's pension plan was first adopted in 1913. The employes make no contribution to it. From 1913 to 1927 pensions were paid out on a pay-as-you-go basis and charged to expense when paid. In 1927 a type of accrual basis was first adopted and a substantial sum

was irrevocably placed in the hands of the Bankers Trust Company of New York as trustee to meet future pension requirements. This was on a "15 year basis" under which accruals were made from and after the completion of the 15th year of employe service. In 1928 Bell adopted the "full service" basis of accrual which was to use accrual rates adequate to distribute the pension costs as a level percentage of the payroll over the full period of employe service. This plan did not provide for the substantial periods toward retirement already accumulated by employes before 1928 and so in 1941 an actuarial deficiency in the fund of $22,-800,000 existed.

Throughout the case this amount is referred to as the "fixed unfunded reserve", the "unfunded actuarial liability" (UAL) or the "unfunded reserve requirement". It is the difference between the amount actually in the fund and the amount which would be in the fund if the pension plan had been funded from its inception with full accrual payments made to the trustee on account thereof. Beginning in 1941 the Company adopted the present "modified remaining cost basis" and increased its charge on account of pensions as an operating expense to include interest at the rate of 3% on the unfunded reserve requirement. This increase, called a "freezing payment", is the amount that the unfunded reserve requirement would have earned, at the assumed interest rate of 3% and was equal in 1948 to $541,370.

The Superior Court's opinion on this subject indicates, in summary, that it concluded that since the Company should have been aware of the fact that the pension fund was not actuarily sound in 1927 the "freezing payments" should have been commenced at that time so that the entire cost of maintaining a pension fund would have been met from then on. It there-

fore remanded the case to the Commission to determine the amount which should have been borne by previous ratepayers and to reduce the sum allowed as an operating expense for pensions by that amount. We disagree with this conclusion and disposition.

The scope of review and the power of the Superior Court to reverse the Commission in this regard is much different from that discussed in the first phase of this case. Here there was no evidence before the Commission on which it could have found that the management abused its discretion. It was therefore not an "error of law" or a situation where there was a "lack of evidence" before the Commission to sustain the freezing payment. Nor was this an instance where the Commission ignored undisputed evidence, as was the case in connection with cash working capital. Consequently, we disagree with the Superior Court in giving controlling effect to the report of Comptroller Heiss of A. T. & T. to his company and the advice of George Buck, consulting actuary to A. T. & T. Neither is in the record. Apparently, in his report Mr. Heiss advised the Company to take steps to prevent the deficiency in the pension fund from mounting and Mr. Buck suggested the initiation of freezing payments in 1928. The Superior Court treats this advice as conclusive not only of the question whether or not the Company should have known that freezing payments were necessary but also of the question whether in 1927 it was an abuse of managerial discretion not to follow such a course of action. It is well settled that neither the Commission nor the Court can substitute its judgment for that of management of a corporation unless there is an abuse of discretion: *Chambersburg Gas Company et al. v. Public Service Commission*, 116 Pa. Superior Ct. 196, 176 A. 794; see *Coplay Cement Manufacturing Co. v. Public Service Commission et al.*, 271 Pa. 58, 114 A. 649.

It may well be that the Bell management had other

reasons for postponing the adoption of the "freezing payments" in 1927 such as economic conditions, the financial status of the company, the effect of an increase in rates at that time. The conclusion of an abuse of discretion ignores these possibilities. In any event, no abuse of discretion was here proved and none can be inferred based solely upon hindsight or the advice above recited. Particularly appropriate in this connection is the statement of the Supreme Court of Vermont in *Petitions of New England Tel. and Tel. Co.*, 80 A. 2d 671, 683 (1951), where it said, in reviewing the very question before this Court: "The only difficulty is the delay in starting the freezing payments. Judged by hindsight, it is now very apparent that freezing payments should have been started in 1929, but we think that the management must be judged by what it then knew or ought to have known. The Bell companies were pioneers in adopting the full service noncontributory plan in 1929, and the costs of pension plans as operating expenses were not then as readily and widely accepted as today, and it was the hope of company officials that the resulting increased expense could be absorbed by it, and that it would not be necessary for it to ask for rate increases at that time. Their hope should be viewed in the light of economic conditions prevailing in 1927 through the early part of 1929. No one then anticipated the approach of the longest and worst depression in our history. Viewed in the light of the circumstances we do not think that the action taken by the company's management was ever such as to be so unreasonable as to constitute an abuse of discretion."

Moreover, as is apparent from the above history of the progression from a pay-as-you-go basis to the "modified remaining cost basis", the Bell officials deemed it advisable to make the change from one system to the other cautiously. In other words the change was made,

as described by the Commission, through a step-by-step method. Perhaps management should have been bolder in their actions but we cannot now say that such decision in 1927 was an abuse of discretion in the light of the circumstances then existing.

The Superior Court and the City of Pittsburgh rely upon the argument that a decision allowing the "freezing payment" places a burden on present and future ratepayers which should have been borne by those in the past. It is obvious, as the City argues and the Superior Court stated, that as a result of the Commission's decision present and future ratepayers must pay that portion of the cost of pensions which is more properly attributable to past services. But the criterion for determining whether present and future ratepayers or the investors in Bell should bear this portion of the cost is not whether past ratepayers should have paid it. If it were, it was illogical for the Superior Court to permit the Company to allow that portion of the pension costs attributable to services rendered between 1913 and 1927 since such costs should have been placed upon ratepayers between those years. Furthermore, even the ratepayers in 1913, by that test, should not have borne the amount which was paid out in pensions on a pay-as-you-go basis and which was attributable to services rendered before 1913.

Reduced to its simplest terms, the situation is this. Pensions are now recognized as a proper operating expense. It is fundamental that in order to afford an adequate retirement program any pension plan must take into consideration past services of employes: *Osborne et al. v. United Gas Improvement Co. et al.*, 354 Pa. 57, 63, 64, 46 A. 2d 208.[5] Someone must pay for

---

[5] Where Justice JONES speaking for this Court said, ". . . a pension plan that did not take into consideration past services as well as prospective services would not furnish an adequate retire-

the pension costs properly attributable to past services. At the present time such costs can be placed upon present and future ratepayers or the investors in the Company. In the present situation the test for determining where the burden should be placed as between these two classes of individuals is whether management abused its discretion in 1927 by not placing the full cost on the ratepayers from that time on. If they did, the investors for whom they acted should bear the cost. If they did not, there is no valid legal objection to placing the burden on present and future ratepayers. Since we have already demonstrated it cannot properly be held that management abused its discretion in 1927, the costs of pensions including the freezing payment were correctly included by the Commission as an operating expense.

The view which we take of this phase of the case is supported by ample authority. On the other hand, the contention of the City of Pittsburgh that these pension costs should be borne by the Bell stockholders is not supported by a decision of any court of last resort. The problem is one common within the Bell System. Courts and Commissions of the following states are in accord with our determination: *Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co.*, 253 Ala. 1, 42 So. 2d 655, 686-689 (1949); *Southern Bell Telephone & Telegraph Company v.*

---

ment allowance; and that would be especially true in the case of older employees of long-continued service. Such a plan would penalize those most in need of the security which a pension is designed to afford. From a company standpoint, the benefits from a pension plan are not merely those individually received by the direct beneficiaries. A pensioning corporation has a very definite interest in seeing to it that no discrimination is worked by its pension plan against any employee and, especially, not by a disregard of 'long-continued service' to the marked disadvantage of its older employees."

*Georgia Public Service Commission*, 203 Ga. 832, 49 S. E. 2d 38, 64 (1948); *Re New England Telephone & Telegraph Co.*, 80 PUR (NS) 397, 417 (Me. 1949); *Re Michigan Bell Telephone Co.*, 85 PUR (NS) 327, 335 (Mich. 1950); *Re Southwestern Bell Telephone Co.*, 77 PUR (NS) 33, 44 (Mo. 1949); *City of Columbus v. Public Utilities Commission*, 154 Ohio St. 107, 93 N. E. 2d 693, 707-708 (1950); *Re New England Telephone & Telegraph Co.*, 83 PUR (NS) 161, 187 (R. I. 1949); *In Re Northwestern Bell Telephone Co.*, 43 N. W. 2d 553, 564-565 (S. D. 1950); cert. denied 340 U. S. 934 (1951); *Petitions of New England Tel. & Tel. Co.*, 80 A. 2d 671, 677-683 (Vt. 1951); *State of Washington ex rel. Pacific Telephone & Telegraph Company v. Department of Public Service*, 19 Wash. 2d 200, 142 P. 2d 498, 523-527 (1943); *Re Wisconsin Telephone Co.*, 80 PUR (NS) 482, 497 (Wis. 1949).

The City of Pittsburgh has also argued that the Bell Company is presently overaccruing its pension fund. Neither the Commission nor the Superior Court discussed this question. In support of this contention the City points to the fact that pension payments in 1948 were $1,225,717.16 while accruals amounted to $5,581,777. In addition, the City submits that the basic pension data on which the accruals were made is erroneous in that the Company overestimates the number of employes to whom it will have to pay pensions. Suffice it to say that the Commission, which examined the evidence, recognized that the need might arise for future adjustments of the fund in the light of future experience but did not find that the assumptions on which the accruals were made were erroneous, and the City does not point to any evidence which required the Commission to so find. We do not intend by our conclusion on this phase of the case to in any manner foreclose the Commission from finding in any rate case an excessive charge to operating expenses due

to an overaccrual of a pension fund. If competent evidence of an overaccrual is presented to the Commission and the Commission is persuaded by such evidence, there should be no hesitation in so finding.

The action of the Superior Court with regard to cash working capital is affirmed as modified by this opinion and the case in this respect is remanded to the Commission for further consideration and redetermination in the manner and to the extent herein directed.

The action of the Superior Court with regard to the inclusion in operating expenses of charges on account of pension fund requirements is reversed and the order of the Commission in this respect is reinstated.

Each party to this appeal shall pay the cost of the printing of its brief. All other costs to be paid by the Bell Company.

---

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I dissent. I would affirm the Order on the opinion of the Superior Court.

---

OPINION BY MR. JUSTICE MUSMANNO, CONCURRING IN PART AND DISSENTING IN PART:

I concur with the majority opinion in the matter of Cash Working Capital, but dissent from the view expressed on the subject of pensions.

I, of course, unreservedly and enthusiastically support pensions for employes. Pensions as a factor in employment are as vital to the welfare of the employe and the stability of the business as proper wages, proper working conditions, proper working hours and proper return of investment. All pensions are salutary just as all life insurance is good, but the premiums and the

method of paying for them are items that depend on the circumstances of each case.

The Pennsylvania Utility Commission in this case allowed the Bell Telephone Company $6,000,000 for pension purposes but it develops that much of this large sum is to be applied to unpaid pension debts incurred many years ago. It is not clear how and why the company failed to provide for this so obvious a burden in the operation of its far-flung enterprise, and why it did not begin the "freezing payments" in 1927 when it knew or should have known that its then pension system was actuarially unsound.

Regardless, however, as to whether the company's failure to install in the past a pension system with costs currently met was due to managerial dereliction or to unavoidable and unforseeable economic conditions, there is no justification for saddling upon the telephone users of today a cost burden which is attributable to past services. If the company overlooked an operation cost of decades ago, the resulting penalty should not be visited upon the customers of today. When any business fails to make as much profit as it should like to make, it is the investors who lose, not the customers. Why should it be any different where the customers, because of the monopoly of the service, are *forced* to be customers of that particular firm or business?

It was pointed out by the City of Pittsburgh that the Modified Remaining Cost Plan advocated by the Bell Telephone Company places upon the telephone users of today the tremendous load that consumers in the past should have borne from 1928 to 1941. This is an observation of far-reaching import. To require the present and future telephone consumer to pay for the past errors of the company is like requiring passengers on an ocean voyage to pay for damages done

the ship years before, when the vessel struck rocks because of the unskillful navigation of its master.

The majority opinion states that the proposition of placing the back pension costs on the Bell Company stockholders is not supported by any precedent in other States. But as to this I cannot agree that the Superior Court of Pennsylvania should abdicate its judgment because courts in other states have reasoned and decided differently. With all due respect to those courts the facts in their cases may have been sufficiently different to explain their particular approach to the problem, or they could even be in error.

Able counsel for the City of Pittsburgh well expressed the crux of this entire pension matter when she said in her brief that the City of Pittsburgh has taken "vigorous exception to the imposition on present ratepayers of an annual charge of six million dollars for pension reserves when the actual yearly cost for pensions was not even one-fifth of that amount. Every one of the two million telephone users in Pennsylvania is now paying over $2.25 per year per telephone for pension reserves alone . . . Pension costs which should have been paid by past telephone users are being imposed as an operating cost on present telephone users."

I see no reason why the telephone user of today should pay a toll on conversations which have passed away into the mists of yesteryear, together with the anonymous talkers now also lost in the unrecorded annals of the past.

Increased rates may or may not be necessary, but it does not follow they are mathematically inevitable on account of the high cost of living. There are other things also to consider in meeting this problem. While the costs for materials and for operation have increased, the company's revenues have also increased in geometric proportions. There is no reason why the five cent coin

should vanish with the buffalo it has immortalized, simply because of the bombardment being levelled against all monetary values.

The City of Pittsburgh contends that the basic figures on which the telephone company builds its pension reserves are not supportable in objective fact, and that, because of this improper foundation, a superstructure of over-accruals has been built up. The City of Pittsburgh should be allowed to present evidence in this regard, and, it may be, upon that showing, that the $6,000,000 allocated for pension purposes can be drastically reduced. And any reduction in the operating cost of a public utility will enure to the benefit of the public. At the same time it will impart encouragement to those who are fighting the battle and building the dikes against the ruinous and ruthless floods of inflation.

There is no danger of injustice being done the telephone company by a resubmission of this question to the Pennsylvania Utility Commission where the company will have full opportunity to support its position, and, at the same time, the telephone user of today will also be protected from the onus of paying for an obligation which he never assumed, for which he was awarded no benefits and for which he receives no credit.

The Pennsylvania Utility Commission should be required to take additional testimony and make additional findings on this subject of pension costs.