Irwin A. POPOWSKY, Consumer
Advocate, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 9, 1997.
Decided May 13, 1997.

Tanya J. McCloskey, Assistant Consumer Advocate, Harrisburg, for petitioner.

Kevin J. Moody, Assistant Counsel, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor, PA Power & Light.

Before COLINS, President Judge, and McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

SMITH, Judge.

█ The Office of Consumer Advocate (OCA) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) in a base rate case filed by Pennsylvania Power & Light Company (PP & L). The questions presented are (1) whether the PUC erred in permitting PP & L to charge current ratepayers for deferred prior period costs associated with a change in post-retirement benefits expense, where this Court previously held that recovery of these very costs would be prohibited by the rule against retroactive ratemaking; (2) whether the PUC's decision to permit PP & L to charge current ratepayers for costs incurred ten years earlier for carrying charges and operation and maintenance expenses associated with the Susquehanna Unit 2 nuclear plant violated the same rule; and (3) whether the PUC's decision to allow PP & L to charge ratepayers for gross receipts taxes that PP & L will not incur violated the actual taxes paid doctrine.[1]

I

A

In December 1990 the Financial Accounting Standards Board issued its Statement of Financial Accounting Standards No. 106 (SFAS 106), which announced a change in the generally accepted method of accounting

---

1. The scope of this Court's review of a decision of the PUC is to determine whether the necessary findings of fact are supported by substantial evidence in the record and whether an error of law or a constitutional violation was committed. *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985).

for a category of expenses apart from pension payments known as "other post-employment benefits" (OPEB), such as health insurance payments. SFAS 106 changed the generally accepted method of accounting from a cash or "pay as you go" basis to an accrual basis, which recognizes employees' currently earned right to such benefits in the future and provides for the availability of funds to meet those costs. The effective date of the change for large employers such as PP & L was January 1, 1993.

For Pennsylvania utilities, increased costs resulting from the change in OPEB accounting fall into three categories: (1) the ongoing incremental cost, that is, the increase under the new method over what the utility previously paid for this expense; (2) the "transition obligation," which is the requirement of accounting for OPEB rights that accrued before the effective date, a sizable amount that may be amortized over periods up to 20 years; and (3) any initial incremental costs that the utility incurs between the effective date and the time when these new expenses are recognized in approved rates. For PP & L this third category applies to the roughly 33 months between January 1, 1993 and September 27, 1995.

In June 1992 PP & L and other utilities jointly petitioned the PUC for pre-approval of SFAS 106 costs. In an order entered November 4, 1992, the PUC stated that recovery of SFAS 106 transition costs would not be deemed to be retroactive ratemaking but that circumstances varied among utilities, and the question should be handled on a case-by-case basis. One month after that order, with no base rate case pending, PP & L filed a petition seeking a declaratory order that its current incremental SFAS 106 costs would be deferred and would be recovered in a future rate case. The PUC granted PP & L permission to record these costs as a regulatory asset subject to recovery in a future rate case to the extent they were prudently incurred. OCA petitioned this Court for review. In *Popowsky v. Pennsylvania Public Utility Commission,* 164 Pa.Cmwlth. 338, 642 A.2d 648 (1994), *appeal denied,* 543 Pa. 733, 673 A.2d 338 (1996) (*PP & L*), this Court reversed.

PP & L filed its current base rate application, its first since 1984, on December 30, 1994, seven months after this Court's decision in *PP & L.* It requested recovery of the same initial incremental costs at issue in *PP & L,* approximately $31.1 million, to be amortized over 17.3 years, in addition to the ongoing incremental cost of $25 million per year. The Administrative Law Judge (ALJ) approved recovery, and the PUC affirmed, finding merit in PP & L's argument based upon *Popowsky v. Pennsylvania Public Utility Commission,* 164 Pa.Cmwlth. 600, 643 A.2d 1146 (1994), *appeal denied,* 543 Pa. 733, 673 A.2d 338 (1996) (*PAWC*). In that base rate case OCA challenged only the SFAS 106 transition obligation, and the Court concluded that the expense arose from an extraordinary and nonrecurring one-time event—the change from cash to accrual accounting—and that permitting recovery amortized over 20 years was not retroactive ratemaking. The PUC also cited *Columbia Gas of Pennsylvania, Inc. v. Pennsylvania Public Utility Commission,* 149 Pa.Cmwlth. 247, 613 A.2d 74 (1992), *aff'd per curiam,* 535 Pa. 517, 636 A.2d 627 (1994), and *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Cmwlth. 69, 410 A.2d 923 (1980).

**B**

In *Philadelphia Elec. Co. v. Pennsylvania Public Utility Commission,* 93 Pa.Cmwlth. 410, 502 A.2d 722 (1985) (*PECO*), this Court explained the prospective nature of ratemaking as follows:

> The general rule is that there may be no line examination of the relative success or failure of the utility to have accurately projected its particular items of expense or revenue and an excess over the projection of an isolated item of revenue or expense may not be, without more, the subject of the Commission's order of refund or recovery, respectively, on the occasion of the utility's subsequent rate increase requests.

> An exception to this rule in the case of retroactive recovery of unanticipated expenses has been recognized where the expenses are extraordinary and nonrecurring.

*PECO,* 502 A.2d at 727–728. In *PP & L* the Court stated that if retroactive ratemaking is permitted, the use of the future test year in ratemaking is rendered meaningless; the general principle is that customers who use power should pay for its production rather than requiring future customers to pay for past use.

OCA begins by stressing that the initial SFAS 106 incremental costs at issue here are precisely the costs that were at issue in *PP & L.* There this Court, relying upon *PECO,* pronounced later recovery of initial SFAS 106 costs to be retroactive, not within the exception for extraordinary expenses and burdensome to future ratepayers. In OCA's view *PP & L* should control the outcome here. OCA further contends that the PUC erred in relying upon *PAWC,* because the initial incremental costs were not involved in that appeal—only the transition obligation was at issue.

OCA also disputes the PUC's reliance on *Columbia Gas,* noting that the Court in *PP & L* concluded that it was not inconsistent. In *Columbia Gas* the Court rejected the utility's claims for pollution investigation costs from past periods that could have been claimed in intervening rate filings. The Court approved recovery of uncollectible billings that were caused by a PUC-imposed budget payment program, because they were deemed to have been claimed at the first opportunity. OCA argues that the present case is distinguishable because the effect of SFAS 106 was an accounting change, which did not require PP & L to expend additional dollars to fund these liabilities from current rates. Also, as the Court noted in *PP & L,* the company could have filed a base rate case sooner in order to assure that the initial incremental costs would be reflected in rates.

In *UGI Corp.* the Court approved recovery of expenses for studies over a period ending six months before the future test year of the feasibility of proposals to enhance the utility's supply capability. The Court stated that those expenses resulted from legitimate business activities conducive to efficiency. They were deemed not to be too remote because similar types of expenditures would be expected to recur. In OCA's view, they were regarded as a proxy for future like expenses. Here, OCA notes, PP & L seeks recovery of the initial incremental costs in addition to the ongoing incremental costs.

OCA finds a closer analogy in *PECO.* There the Court affirmed the PUC's disallowance of initial costs the utility incurred for operating and depreciation expenses for expensive pollution control facilities that it was required to install under a consent order in order to continue burning cheap, low-quality coal at two power plants. Although the PUC previously approved deferred consideration of these costs in a future rate case, it later determined on the merits that allowing them would constitute retroactive ratemaking. This Court agreed and concluded also that the expenses were neither extraordinary nor nonrecurring so as to fall within the exception, noting that the utility had been granted prospective operating, maintenance and depreciation for the facilities, a conclusion that OCA likens to that in *PP & L.* In its reply brief OCA asserts that PP & L essentially "bet" ratepayers' funds on the outcome of the petition proceeding in *PP & L;* it lost the gamble, and that should be the end of the matter.

The PUC responds by referring to *PAWC:*

In this case also [as in *Columbia Gas* ], PAWC had no opportunity to seek recovery of its OPEBs until the issuance and acceptance of SFAS 106 and the Commission's approval of accrued accounting treatment of such obligations. We, therefore, hold that PAWC's application is timely; that the transitional obligation arises from an extraordinary and non-recurring one time event—the change from cash to accrual accounting—and the allowance of the recovery of that obligation amortized over a period of twenty years is not retroactive ratemaking.

*PAWC,* 643 A.2d at 1150. The PUC refers also to its adoption of a policy statement for implementation of SFAS 106 effective June 19, 1993, 52 Pa.Code § 69.351, which included a statement of its intent to allow deferred recovery in base rates of SFAS 106 costs prudently incurred.

The PUC further argues that the situation here is virtually identical to that in *City of*

*Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952) (*Bell Telephone* ). There the Supreme Court held that payments to fund accrued pension rights that were not accounted for when the utility moved from cash to accrual pension funding more than twenty years earlier did not result from a prior abuse of managerial discretion and· were properly collected from present and future ratepayers.

PP & L, as intervenor, notes that it acted expeditiously to recover these costs and asserts that its reliance on the petition for a declaratory order was based on other orders in which the PUC declared that particular expenses would be recoverable in future rate cases. It argues that, as with the uncollectible budget payment plan arrearages at issue in *Columbia Gas,* here PP & L had no reason to claim incremental OPEB costs until it first learned that they would begin to be assessed, and it took prompt action and reasonably relied upon the PUC's decision in its favor in the petition proceeding, even though that was later overturned.

Further, the initial incremental costs at issue here do not relate to a period for which PP & L previously made future test year projections in an earlier rate filing, as was the case in *PECO,* and there were no intervening rate filings in which PP & L could have claimed these costs, as was true for the portion of the pollution investigation expenses disallowed in *Columbia Gas. PP & L* does not require reversal here, because that case held simply that the initial incremental costs could not be approved outside the context of a rate case. Finally, PP & L argues that if *PP & L* stands for an outright ban on recovery of prior period costs, ·then it is contrary to *Bell Telephone.*

C

■ In this Court's view, the PUC correctly permitted recovery of the initial SFAS 106 incremental costs. First, the Court does not regard *PP & L* as controlling. Although the same costs were at issue there, the holding applied only to what was before the Court in that case, namely the PUC's approval of the deferred recovery of these costs outside the context of a base rate. The

question of whether these costs could be approved in a base rate case was not presented and therefore could not be determined.

Second, the Court agrees that *PAWC* provides the proper guide for the analysis in this case. As was noted in *PAWC,* the request to recover initial incremental costs did not arise out of an inaccurate projection of OPEB costs by PP & L in an earlier proceeding, which is part of the basic rationale for not permitting retroactive claims. Rather, the request was caused by the imposition upon PP & L from the outside of a new method of accounting in regard to this substantial expense item, which was not something that PP & L could have anticipated at the time of its last rate application in·1984. *PAWC,* in the context of a base rate case, held that the transition obligation resulted from an extraordinary and nonrecurring one-time event, the change from cash to accrual accounting under SFAS 106. The Court concludes that the same holding cannot be withheld from the initial incremental amounts simply because they are a separate category of SFAS 106 expenses.

■ The PUC may take into account extraordinary losses or gains that occurred in the past by amortizing them over a period of years. *Pike County Light and Power Co. v. Pennsylvania Public Utility Commission,* 87 Pa.Cmwlth. 451, 487 A.2d 118 (1985). Once a particular expense is recognized as falling within this exception, its recovery at a later time does not violate the rule against retroactive ratemaking. In *Pike County,* before remanding for further fact finding, the Court held that requiring the utility to recognize extraordinary carryover losses from prior periods against its present claim for income tax expenses did not constitute retroactive ratemaking.

In *Columbia Gas* the former Department of Environmental Resources ordered the utility to investigate the presence of coal tar residue in a creek bordering the utility's property. The utility chose not to claim expenses it was incurring under that order in its next two rate filings. The Court concluded that the initial expenses were unantic-

ipated and would have been recoverable had the utility sought recovery in its next rate filing. After the project was underway, the expenses were not unanticipated for purposes of later rate filings. The Court affirmed the PUC's allowance of the expenses relating to the future test year and disallowance of earlier expenses.

The utility also was required to write off a portion of arrearages of its most payment-troubled customers, which arrearages were mounting under a budget payment program imposed by the PUC. The Court concluded that, despite intervening rate filings, recovery of these expenses was within the exception because the utility claimed them at the first reasonable opportunity, that is, after it was informed by outside auditors that the arrearages could no longer properly be characterized as accounts receivable and when the effects of the program were no longer speculative.

■ OCA's other arguments are not persuasive. Contrary to OCA's assertions, the record here shows that PP & L did not regard the new OPEB expenses as something it could simply absorb with its current revenue under its existing tariff. Rather, PP & L took steps beginning at least in June 1992 with the filing of the joint petition to assure deferred recovery of SFAS 106 costs or at least deferred consideration of them in a later rate case. A closer question is OCA's insistence that because of the notice PP & L had, it needed only to file its base rate proceeding earlier to assure that SFAS 106 incremental costs would be prospective when claimed and thereby avoid the retroactivity problem altogether.

Several factors counter this argument, however. One is that this reasoning would have required all large utilities to make new base rate filings nine months before January 1, 1993 (the total period for notice, investigation and decision) in order to assure recovery of a single expense item. As noted by PUC counsel at argument, the PUC actively sought to avoid such a mass base rate filing. The PUC's November 1992 order on the joint petition stated that recovery of SFAS 106 transition costs would be considered on a case-by-case basis but did not require that

such consideration take place only in a base rate case. Further, the PUC's policy statement at 52 Pa.Code § 69.351, expressly stated that OPEB expenses under SFAS 106 would be subject to recovery in future rate proceedings to the extent that they were prudently incurred and reasonable. Accordingly, the Court affirms the PUC's approval of recovery of the initial incremental costs.

## II

■ PP & L's nuclear power plant Susquehanna Unit No. 1 commenced commercial service June 8, 1983, and it was recognized in rates effective August 22, 1983; Susquehanna Unit No. 2 commenced service February 12, 1985 and was recognized in rates effective April 26, 1985. Under regulations of the Federal Energy Regulatory Commission, the accrual for the "allowance for funds used during construction," which becomes part of the utility's rate base, stops when commercial operation starts. "Early window" costs are the carrying charges thus imposed on the utility and costs of operation and maintenance from the date of commercial operation until the unit is recognized in rates.

In 1982 and 1983 PP & L filed petitions for declaratory orders requesting deferral of the early window costs for the two nuclear plants. By orders entered in 1983 for Unit No. 1 and 1985 for Unit No. 2, the PUC granted deferred consideration of these costs, while expressly not deciding that the costs were recoverable or, if they were, the amounts that would be approved. The later order expressly prohibited PP & L from claiming its Unit No. 2 early window costs in the 1985 proceeding to recognize that unit in rates. Those orders were not appealed.

In its present base rate application PP & L requested approximately $39.2 million for early window costs for both units (with no claim for interest accrued since the costs were incurred) to be amortized over 10 years. The ALJ rejected OCA's general retroactive ratemaking challenge to the early window costs, noting that PP & L carefully sought and received deferral and that the PUC's orders granting deferral specified no time limit. However, because PP & L had an

early opportunity in its 1985 base rate case to seek recovery of the Unit No. 1 early window costs and did not do so, the ALJ disapproved that portion of the claim. He approved an amortized amount of $1.866 million per year for the Unit No. 2 early window costs. The PUC affirmed.

■ OCA emphasizes that PP & L incurred the early window costs at issue here some 10 years before its current rate filing. On this issue OCA relies principally upon *PECO* and *PP & L,* and the discussion in those cases of extraordinary expenses as being not simply unanticipated but also "a substantial, one-time expense or a substantial item that will not appear as a continuing expense and could otherwise never be recovered in rates because, like the weather-related expenses, it would be normalized out of the test year as abnormal." *PP & L,* 642 A.2d at 652.

The PUC relies upon *Columbia Gas* and *PAWC,* where the Court concluded that the utility had sought recovery of some of the disputed past expenses at the earliest opportunity, that is, in its next rate case. It notes further that its policy is not to permit recovery of early window costs in the rate case seeking recognition of a new power plant on the grounds that such claims are premature. The PUC quotes *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 74 Pa. P.U.C. 1, 111 (1990): " 'Early window' costs are extraordinary for the reason that the initial commercial operation of a large nuclear power plant, costing billions of dollars, occurs *infrequently,* and clearly represents a nonrecurring event." (Emphasis in the original.)

PP & L notes the inherent difficulty in matching the inservice date of a new nuclear plant, subject to extensive federal and state regulation, with the date of its recognition in rates, which difficulty led the PUC to issue the two orders deferring consideration of the early window costs. PP & L cites *Norfolk and Western Ry. Co. v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 413 A.2d 1037 (1980), for the settled principle that judicial discretion should not be substituted for the broad administrative discretion afforded to the PUC in setting just and reasonable rates. PP & L contends that the PUC's innovative solution to the problem of nuclear plant early window costs in its 1983 and 1985 orders permitting deferred consideration falls within the PUC's discretion.

PP & L also quotes Section 1308(d) of the Public Utility Code (Code), 66 Pa.C.S. § 1308(d), which provides in part: "The commission shall consider the effect of such [seven-month period of] suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility...." Because the early window costs at issue here were incurred during the period of suspension in PP & L's 1985 rate case to recognize Unit No. 2, PP & L argues that Section 1308(d) authorizes consideration of them. On the issue of retroactive ratemaking, PP & L contends that *PECO, Columbia Gas* and *PAWC* stand for the proposition that whenever a utility had no opportunity to predict or reason to claim prior period costs in an earlier rate case, the doctrine of retroactive ratemaking will not operate to deny recovery of such costs.

This Court concludes that, in view of the existence of the PUC's unappealed 1985 order granting deferred consideration of the early window costs without a time limit, the mere passage of a substantial amount of time is not relevant. Also, Section 1308(d) of the Code requires consideration of events that occurred during the suspension period. Where the PUC prevented PP & L from claiming Unit No. 2 early window costs in the 1985 proceeding, it properly afforded consideration in the next rate filing.

This conclusion, however, also determines the substantive issue of whether the PUC's approval of recovery of these costs constituted retroactive ratemaking. A claim for these costs in the 1985 rate proceeding would not have been retroactive. Under the PUC's order such a claim was deferred until the next base rate case. The effect of that order was essentially to grant consideration nunc pro tunc. OCA has not challenged the Unit No. 2 early window costs on any basis other than retroactive ratemaking; therefore, the Court concludes that the PUC properly approved their recovery.

### III

Pennsylvania utilities are subject to a tax on their gross receipts pursuant to the Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §§ 8101–8103. PP & L requested an allowance for gross receipts tax based upon the full amount of revenues to be approved by the PUC. All participants, however, acknowledge that PP & L will not collect all of the revenue for which it bills; some bills will be uncollectible. OCA proposed an adjustment of $745,000 to reflect that PP & L will pay gross receipts tax only on receipts that it actually receives. PP & L's witness testified that PP & L must receive all revenue authorized in order to earn the rate of return authorized. The fact that some bills will be uncollectible already means it will not earn its full rate of return, and approval of OCA's adjustment would only make the deficiency worse.

The ALJ approved OCA's adjustment, stating that it was not clear whether the amount at issue was already provided for in the amount PP & L claimed for uncollectibles; unless PP & L could show that it was not, then approving the full tax allowance would result in double counting. The PUC reversed on this point, stating only that it agreed that an adjustment would serve to assure that PP & L would not earn its allowed rate of return.

■ OCA argues here that the PUC has permitted PP & L to bill for sufficient revenue to earn its authorized rate of return by including the allowance for uncollectibles in the revenue requirement. In cases applying the "actual taxes paid" doctrine, where the recovery of income tax expense for a utility participating in a consolidated tax return has been allowed only to the extent of the utility's actual proportionate share of overall taxes paid, the courts have held that a utility must prove that a tax expense included in rates bears a fair and substantial relationship to actual tax expense. When the PUC approves hypothetical expenses not actually incurred, it commits an error of law. *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985).

The PUC contends that OCA's position is internally inconsistent: OCA states that PP & L will not collect all of its authorized revenue, yet OCA also assumes that PP & L will be made whole through its uncollectible accounts expense item. PP & L alleges, without citation to the record, that it neglected to claim an additional uncollectible accounts expense associated with the revenue increase requested in this proceeding and so understated its uncollectibles expense by $1.6 million, more than offsetting OCA's proposed adjustment. It asserts that the PUC's denial of OCA's adjustment was within its discretion, citing a decision stating that errors in the PUC's calculation of different capital amounts in determining the rate of return offset and so were harmless. PP & L asserts that the actual taxes paid doctrine concerns preventing excess profit whereas the concern here is not to further detract from the authorized rate of return.

■ The Court agrees with OCA on this point. PP & L made claims for uncollectibles, which were granted and which have not been challenged; the Court must assume that PP & L requested sufficient amounts. PP & L in effect requests this Court to assume the role of fact finder and to approve a tax allowance greater than it will actually pay in order to make up for an alleged mistake in its own rate request. Such a request is not the same as a reviewing court's conclusion that particular errors by the PUC roughly offset. "Where an expense is not actually incurred, be it for taxes or otherwise, it is improper to include it in the rates charged to the ratepayers." *Barasch,* 507 Pa. at 569, 493 A.2d at 657. Accordingly, the PUC is reversed on this issue. In all other respects, the decision of the PUC is affirmed.[2]

### ORDER

AND NOW, this 13th day of May, 1997, the order of the Pennsylvania Public Utility Commission is reversed insofar as it refused an adjustment to the amount Pennsylvania Power and Light Company was permitted to recover in rates relating to its payment of

---

**2.** Judge Leadbetter did not participate in the decision of this case.

the gross receipts tax pursuant to 72 P.S. §§ 8101—8103, and this case is remanded for a recalculation and issuance of an appropriate order. In all other respects the order is affirmed.

Jurisdiction is relinquished.

PELLEGRINI, Judge, dissenting.

The majority opinion upsets the "rate bargain" between Pennsylvania Power & Light Company (PP & L) and its ratepayers by making the ratepayers pay for something that they already paid for and giving PP & L a 31 million dollar windfall. Not only does it breach the rate bargain, the majority throws ratemaking into a complete turmoil. For example, as PP & L's counsel admits, if interest rates go down resulting in a higher than anticipated rate of return to the utility, ratepayers can seek recovery of excess rates of return in future rate cases. Under the majority's analysis, nothing is ever settled, making the ratemaking system unworkable.

Under the present system, when the Pennsylvania Public Utility Commission (PUC) issues a rate tariff, the presumption is that the rates set for that utility are fair and reasonable and will cover all expenses and costs that the utility incurs during the time the tariff remains in effect. If a utility feels that rates paid by its ratepayers fail to give it a sufficient rate of return, it is free to file a rate case proposing to raise rates. Even if rates are excessive, for example, where the rate of return becomes too high due to declining interest rates, the ratepayer is obligated to pay the tariff rate unless it or someone on its behalf files a successful challenge to the rates.

What the majority countenances in this case is for a utility to take past costs and expenses incurred under an existing tariff and carry them forward, requiring the ratepayers to pay for an expense even though they are presumed to have paid for it when it came due, impermissibly increasing the adjudicated rate of return for the utility. By allowing such an outcome, the PUC and the majority directly contravene the doctrine against retroactive ratemaking and upset the "bargain" between the utility and its ratepayers as envisioned by the Public Utility Code.

The bargain established in the prior rate case was challenged when PP & L filed a general rate case requesting an increase in rates to produce more than $261 million annually. One of the bases for the proposed increase was the cost of complying with an accounting change relating to post-retirement obligations other than pensions (called OPEBs). In December of 1990, the Financial Accounting Standards Board issued Statement of Accounting Standards (SFAS) 106 which was made effective January 1, 1993. SFAS 106 had been under consideration for nearly a decade. In November of 1982, the Financial Accounting Standards Board released a statement of preliminary views proposing that the accrual method be imposed. In September of 1989, a proposed draft of SFAS 106 was released. Additionally, SFAS 106 did not become effective for more than two years from the date it was issued.

In *Popowsky v. Pennsylvania Public Utility Commission*, 164 Pa.Cmwlth. 338, 642 A.2d 648, 649 (1994), *petition for allowance of appeal denied*, 543 Pa. 733, 673 A.2d 338 (1996) (*PP & L I*), we explained the effect of SFAS 106 as follows:

> SFAS 106 requires companies to move from the pay-as-you-go or cash basis for OPEBs to an accrual method of accounting based on the belief that OPEBs are a form of deferred compensation and the present cost should represent costs of obligations presently incurred. The change from the pay-as-you-go method to the accrual method creates transitional obligations, that is, the accumulated liability for OPEB expenses for both present employee and current retirees during the period up to the date of conversion to an accrual method which had been deferred for future periods under the pay-as-you-go basis.

The accrual method, simply put, requires employers, including utilities, to record as a liability the post-retirement benefits its employees earn during the course of the actual employment.

The PUC responded to a request from several utility companies, including PP & L, on how to handle the effects of SFAS 106,

stating that because there is a wide disparity in post-retirement benefits provided by utility companies, the appropriate amount of the transitional obligation and a change from the pay-as-you-go to the accrual method for ratemaking purposes should be decided on a case-by-case basis.[1]

PP & L then filed a petition for a declaratory order requesting to defer for accounting purposes and recover in future rates its current incremental costs, that is, the additional amount above and beyond the pay-as-you-go costs which are already reflected in current rates, which are booked under the accrual method pursuant to SFAS 106 until the next rate case. The PUC granted PP & L permission to record as a regulatory asset the incremental costs incurred between the date of the adoption of SFAS 106 and the date of new rates, including the amortization of the transitional obligation costs. In effect, in that case, the PUC allowed what is at issue here; it altered the bargain between the utility and the ratepayers by requiring the ratepayers to pay more than the prospective costs for power in the new rate case.

On an appeal by the Office of Consumer Advocate (OCA), this court held in *PP & L I* that the recovery of such deferred incremental costs in a subsequent rate case would be prohibited by the rule against retroactive ratemaking. Reversing the PUC's order, we stated:

> In this case, the additional incremental costs would be added to the burden of the future ratepayers even though the accounting method was changed in 1993.... Because the incremental costs recovered in some future rate case would relate to 1993 and the years up until the next rate case, what PP & L requested and the PUC ordered is retroactive ratemaking.

. . .

> Because the incremental costs were, in fact, anticipated before the request for declaratory order was filed and because the costs are recurring and could otherwise be recoverable in rates, the exception for "extraordinary" expenses does not apply. Therefore, the incremental costs would be prohibited by the rule against retroactive ratemaking and the PUC's order improperly assures future recovery.

*Id.* 642 A.2d at 652–53.

On December 30, 1994, PP & L filed this rate case with the PUC, which, among other things, included a claim for $31.1 million dollars in deferred costs, to be amortized over 17.3 years, the same cost we rejected in *PP & L I.* This item represents that portion of the transitional obligation which was incurred by PP & L under its existing tariff and recorded on its books under the accrual method from the time SFAS 106 became effective on January 1, 1993, until the effective date of the rates proposed in its present rate case (assumed to be September 30, 1995). The recovery of this $31.1 million dollars in incremental costs over 17.3 years would result in a $1.5 million dollar increase in annual rates over the period of amortization. The PUC permitted these costs, although changing the amortization period to ten years, resulting in an even higher annual increase in rates for ratepayers.[2]

The majority opinion affirms the PUC's result requiring the payment of an additional $31.1 million dollars in incremental costs, even though those costs were deferred from a prior period and is the exact recovery of costs determined to be retroactive ratemaking in *PP & L I.* Relying on *Popowsky v. Pennsylvania Public Utility Commission,*

---

1. *Pennsylvania Public Utility Commission v. Philadelphia Electric Co., et al.,* P–920588 (P.U.C. November 4, 1992). *See* 52 Pa.Code § 69.351.

2. In making its erroneous decision, the PUC, to achieve an outcome, misread the following statement in *PP & L I:* "PP & L could have recovered those costs had it filed a rate case rather than a request for declaratory order", *PP & L I,* 642 A.2d at 652, interpreting it to mean that the recovery of incremental costs is retroactive ratemaking if done outside of a rate case, but is not retroactive ratemaking if done within a rate case.

Under that logic, a utility could seek retroactively wage increases that occurred during the previous rate case so long as it did so in a rate case. As the PUC should know, what this statement means is that the transitional obligation on a going-forward basis is not retroactive ratemaking, and PP & L could have recovered those costs if it had filed a rate case prior to or at the time it incurred that obligation, but because it chose not to file a rate case, those same costs now relate to a past period and cannot be recovered.

164 Pa.Cmwlth. 600, 643 A.2d 1146 (1994), *petition for allowance of appeal denied,* 543 Pa. 733, 673 A.2d 338 (1996) *(PAWC,)* [3] the majority holds that the rule against retroactive ratemaking does not apply because the utility acted expeditiously to request recovery of these costs in rates and because the exception to the rule for extraordinary costs applies. *PAWC* simply does not apply.

In *PAWC,* the water company filed a rate case in July of 1992 requesting an increase in rates. The water company included a claim for the incremental accrued OPEB costs for the period from January 1, 1993, when SFAS 106 became effective, until April 22, 1993, the proposed effective date of the new tariff. Because this portion of the transitional obligation was incurred during the automatic suspension of the tariff under the Code, we held that the recovery of those costs, in addition to the transitional obligation on a going-forward basis, was not retroactive ratemaking. *PAWC,* 643 A.2d at 1150. *See* Section 1308(d) of the Public Utility Code, 66 Pa.C.S. § 1308(d) (the PUC may consider changes occurring during the period of suspension). As such, the PUC's and the majority's reliance on *PAWC* is misplaced; the decision in *PAWC* does not stand for the proposition that costs incurred in a past period are recoverable because the only incremental costs incurred in that case were incurred *after* the rate case was filed.[4]

I agree, as we held in *PAWC,* that the recovery of the transitional obligation [5] on a going-forward basis is not retroactive ratemaking. However, that is not the issue in this case; the issue is whether the recovery of that portion of the transitional costs incurred since the time of the accounting change until the present rate case is retroactive ratemaking. This exact issue was decided unfavorably to the utility in *PP & L I,* and the PUC erred in refusing to follow that decision. In *PP & L I,* as discussed, *supra,* PP & L sought an assurance that it could recover its incremental costs at some future time, from future ratepayers, because it wished to postpone the filing of a rate case. We held that the incremental costs for a period of time after the change to the accrual method but before the rate case was filed could not be permitted in a future rate case under the rule against retroactive ratemaking, because those costs, as part of the transitional obligation, were recurring, and PP & L could recover those costs if it filed a rate case before or at the time they were incurred.

The rule against retroactive ratemaking is long-standing and is based on sound principles. *See, e.g., Philadelphia Electric Company v. Pennsylvania Public Utility Commission,* 93 Pa.Cmwlth. 410, 502 A.2d 722 (1985); *Pike County Light & Power Company v. Pennsylvania Public Utility Commission,* 87 Pa.Cmwlth. 451, 487 A.2d 118 (1985). As we stated in *PP & L I:*

> The rule against retroactive ratemaking prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits. Kreiger, The Ghost of Regulation Past: Current Appli-

---

3. That case involved a rate case filed by Pennsylvania–American Water Company or PAWC.

4. This case is also distinguishable from the decision in *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952) (*Bell Telephone* ), relied on by the PUC, because in that case, the rule against retroactive ratemaking was not addressed. In *Bell Telephone,* the issue raised was whether the amount required to pay up a pension fund, so that it would be at the level it would have been if full accrual payments had been made from the inception of the fund, was a proper operating expense. The Supreme Court held that the expenses could be charged to ratepayers rather than stockholders, because the utility did not abuse its managerial discretion in failing to pay full accrual payments from the inception of the pension fund and that

they anticipated defined steps to pay up the fund. Although the ratepayers challenging the rates argued that future ratepayers should not be responsible for accrual payments related to prior service, rather than addressing the retroactivity of the payments, the Supreme Court stated that the criterion for determining whether ratepayers or investors should bear the cost is not whether past ratepayers should have paid it. Because the decision in *Bell Telephone* avoided the issue raised in this case, it is inapplicable to our analysis.

5. As explained above, the transitional obligation is the company's accumulated liability for OPEB expenses during the period up to the conversion to the accrual method which are amortized so that a portion comes due each year during the amortization period.

cations of the Rule Against Retroactive Ratemaking in Public Utility Proceedings, 1991, Univ.Ill.L.Rev. 983, 984. The policy reasons behind this rule are that if retroactive ratemaking is allowed, it makes the "test year" method of ratemaking meaningless and the general principle that those customers who use power should pay for its production rather than requiring future ratepayers to pay for past use.

*PP & L I,* 642 A.2d at 651.

The $31 million dollar incremental costs allowed by the PUC in this case were incurred by PP & L from January 1, 1993, through September 30, 1995, and were allowed even though the rate case was not filed until December 30, 1994.[6] Those costs were deferred from a prior period of time and, as such, were an attempt to set future rates based on past losses, violating the rule against retroactive ratemaking. It was PP & L, adhering to its corporate objective to delay filing a rate base case until 1994–95, that chose when to file its rate case. The Public Utility Code does not proscribe the timing of a utility's rate case, leaving it to the option of

the utility, based on the rate of return it is receiving and the rate it believes it can get in a new rate case. *See* Section 1308 of the Public Utility Code, 66 Pa.C.S. § 1308.

Because PP & L did not file a new rate case, we can assume that it was receiving an adequate rate of return or did not think it could get a better rate by filing a rate case, despite the $25 million dollar annual cost of going forward under the accrual method for OPEBs. Obviously, there are other considerations in determining when to file a rate case, but that does not change the simple fact that it was PP & L's choice when to file. It had no guarantee that the incremental costs for the period from the date they changed to the accrual method until their rate case was filed would ever be recovered,[7] especially in light of the long-standing application of the rule against retroactive ratemaking.[8]

Because PP & L is specifically requesting to recover a cost that relates to a prior period and those costs are not extraordinary,[9] such recovery is retroactive ratemak-

6. If, as in *PAWC*, the incremental costs allowed were only for the period from December 30, 1994, when the rate case was filed, through September 30, 1995, when the rates were effective, I would agree that recovery was allowable. *See* Section 1308(d) of the Public Utility Code, 66 Pa.C.S. § 1308(d) (the PUC may consider changes occurring during the period of suspension).

7. Just because the PUC issued a policy statement that allowed each utility to use single-issue petitions for declaratory orders to request recovery of SFAS 106 costs, purportedly so that it would not be overworked, offers no solace. A policy statement is what the PUC believes the law to be, not what it is—it is not unheard of that the PUC is reversed on appeal. A party always acts on a PUC policy statement knowing that it bears the risk that the policy statement is simply wrong. *See Shenango Township Board of Supervisors v. Pennsylvania Public Utility Commission,* 686 A.2d 910 (Pa.Cmwlth.1996).

8. PP & L argues that it acted expeditiously in order to ensure recovery of these costs. I disagree. PP & L always had the choice whether and when to come in for a rate case. Instead, it chose the manner of proceeding, first in the joint action with numerous other utilities in 1992, and then in the declaratory judgment action addressed in *PP & L I.*

9. An extraordinary expense is an unanticipated, non-recurring, substantial expense to the rate

base that would be normalized out if occurring in a test year. *PP & L I,* 642 A.2d at 652. Although we held in *PAWC* that the general transitional obligation is extraordinary because it was caused by a non-recurring, one-time event— the change in accounting standards—the incremental costs at issue here are not extraordinary because not only were they caused by the change in accounting principles, they were also caused by the utility's choice not to file a rate case. As noted above, PP & L knew about the change in accounting standards and the creation of the transitional obligation at the latest in 1990. Even with this knowledge of a $25.5 million dollar increase in expenses, PP & L alone determined when to request a change in rates, waiting nearly two years from the change on January 1, 1993, to file its rate case.

In making its choice of when to file its base rate case, PP & L was in a similar position to Columbia Gas in relation to its costs incurred due to orders from the Department of Environmental Resources to investigate the migration of pollutants in *Columbia Gas of Pennsylvania, Inc. v. Pennsylvania Public Utility Commission,* 149 Pa.Cmwlth. 247, 613 A.2d 74 (1992), *aff'd per curiam,* 535 Pa. 517, 636 A.2d 627 (1994). In that case, because Columbia Gas unilaterally chose not to request recovery of the costs of complying with the DER order until the full total was established, we considered the on-going expenses anticipated and not recoverable as retroactive. Although in that case, there was an inter-

ing and this court should reverse the PUC's allowance of those costs. Otherwise, nothing is ever settled between the utilities, the PUC, the OCA, and the ratepayers, who will always be trying to revisit the "bargain". Contract law can't work that way; neither can public utility regulation.

Accordingly, although agreeing with the remainder of the majority opinion, I would reverse the PUC in that part allowing recovery of $31 million dollars in incremental costs prior to the filing of the rate case which was in defiance of the rule against retroactive ratemaking and this court's decision in *PP & L I.*

KELLEY, J., joins in this dissenting opinion.

vening base rate case, the fact remains that it was the utility's choice of when to request recovery of those costs that determined whether they were anticipated.